ALTECH CONTROLS CORPORATION and Richard Alsenz, Plaintiffs,

v.

E.I.L. INSTRUMENTS, INC., Defendant.

No. Civ.A. H–92–3189.

United States District Court, S.D. Texas, Houston Division.

Sept. 21, 1999.

David S. Wise, Sulzer Medica USA Inc., Houston, TX, Ned L. Conley, Houston, TX, Randy J. McClanahan, McClanahan & Associates, Houston, TX, Neal Elton Dry, Dry & Tassin, Houston, TX, for Plaintiffs.

Albert Berton Deaver, Jr., Arnold White & Durkee, Houston, TX, Michael O. Sutton, Sidley & Austin, Dallas, TX, John R. Schiffhauer, Fish & Richardson, Menlo Park, CA, Albert Berton Deaver, Jr., Arnold White & Durkee, Houston, TX, Michael O. Sutton, Sidley & Austin, Dallas, TX, for Defendants.

### ORDER

HARMON, District Judge.

Pending before the Court in the above referenced action, alleging patent infringement of three patents,[1] Defendant E.I.L.'s post-trial motion, pursuant to Fed.R.Civ.P. 50, for judgment as a matter of law that the RC–48 controller did not infringe the '700 patent (instrument # 446).

Under *Hilton Davis Chemical Company v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1520 (Fed.Cir.1995) (*en banc*), *rev'd on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), infringement is a question of fact for the jury. *Inter alia,* the issues of infringement under the doctrine of equivalents and literal infringement of the '700 patent by E.I.L.'s RC–48 were tried to a jury from December 9–22, 1997. Specifically the jury found that the RC–48 controller literally and under the

---

1. United States Patent No. 4,612,776 ("the '776 patent"), issued on September 23, 1986, United States Patent No. 4,628,700 ("the '700 patent"), issued on December 16, 1986, and United States Patent No. 5,067,326 ("the '326 patent"), issued on November 26, 1991.

doctrine of equivalents infringed Claims 9, 10, and 14 of the '700 patent (# 408).

### Standard of Review

Under Federal Rule of Civil Procedure 50(a)(1), a district court may grant a judgment as a matter of law ("JMOL"), formerly known as a directed verdict, if after a party has been fully heard by the jury on an issue, "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *See Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1174 (Fed.Cir.1999), *cert. denied*, —— U.S. ——, 119 S.Ct. 2395, 144 L.Ed.2d 796 (1999); *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir.1994). Upon a motion for JMOL, a district court must review a jury's resolution of factual issues to determine whether there is substantial evidence to support them. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975–76 (Fed.Cir.1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Only if the movant shows that when the correct legal standard is applied, there is not substantial evidence to support the finding in favor of the nonmovant, should the jury's factual findings be overruled. *Id.* "Substantial evidence is 'such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review.'" *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed.Cir.1996) (quoting *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997). In reviewing factual issues for substantial evidence, the court must inquire whether a reasonable jury, in light of the record before it viewed as a whole, could have arrived at the decision reached by the actual jury. *Dawn Equipment v.*

*Kentucky Farms, Inc.*, 140 F.3d 1009 (Fed.Cir.1998). If legal conclusions implied from the jury's verdict cannot in law be supported by those findings, a JMOL is appropriate. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1453 (Fed.Cir. 1998), *citing Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547–48 (Fed.Cir.1994) [, *cert. denied*, 514 U.S. 1032, 115 S.Ct. 1393, 131 L.Ed.2d 244 (1995) ].

### Literal Infringement and Infringement Under Doctrine of Equivalents

This Court previously determined that element D of claim 9 is written in means-plus-function format under 35 U.S.C. § 112(6) [2] and instructed the jury accordingly. Ex. F, Jury Charge; Trial Transcript ("TT"), Vol. 9A at p.2088.

■ For a literal infringement of a section 112 limitation, the fact finder must determine whether the accused device performs an identical function to the one recited in the means-plus-function clause. *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed.Cir.1998). If an identical function is not performed, there is no literal infringement. *Id.* If the identical function is performed, the fact finder next must decide whether the accused device uses the same structure or materials as described in the specification, or their equivalents. *Id.; see also Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987) (*en banc*) ("To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for the structure"), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). Because determining the claimed function and determining the

---

2. Section 112(6) provides,

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

corresponding structure for a claim limitation written in means-plus-function format are matters of claim construction, they are issues of law for the court. *WMS Gaming, Inc. v. International Game Technology,* 184 F.3d 1339, 1346 (Fed.Cir.1999), *citing Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1308 (Fed.Cir.1998).

█ A determination of infringement under the doctrine of equivalents involves a decision whether the structural differences between the particular elements of the accused device and the asserted claims limitations as recited in the claim and as shown in the corresponding means structures in the specification are substantial. *Id.* An accused device that does not literally infringe a claim may still infringe a claim under the doctrine of equivalents if each limitation claim is met in the accused device either literally or equivalently. *Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1459 (Fed.Cir.1998). Under the doctrine of equivalents, if the accused device performs in a substantially different way or obtains a substantially different result, it does not infringe. *Mas–Hamilton Group,* 156 F.3d at 1213.

█ Prosecution history estoppel imposes a legal limitation on the application of the doctrine of equivalents in excluding from the range of equivalents any subject matter surrendered during the prosecution of the application for the patent, e.g., when matter is surrendered because of amendments to overcome patentability objections or because of argument to secure allowance of a claim. *Cybor,* 138 F.3d at 1460, *citing Warner–Jenkinson Co. v. Hilton Davis,* 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997), and *Wang Lab., Inc. v. Mitsubishi Elecs. Inc.,* 103 F.3d

1571, 1578 (Fed.Cir.1997) [, *cert. denied,* 522 U.S. 818, 118 S.Ct. 69, 139 L.Ed.2d 30 (1997) ]. Prosecution history estoppel is a legal question. *Id.*

## E.I.L.'S JMOL MOTION

In the instant JMOL motion, E.I.L. argues that the temperature compensation feature of the accused RC–48 controller fails to satisfy the temperature compensation element of claims 9, 10, or 14[3] of the '700 patent because it does not operate in the same way. E.I.L. insists that there was no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs Altech Controls Corporation ("Altech") and Richard Alsenz ("Alsenz") that the temperature compensation feature of the asserted claims of the '700 patent covers, either literally or under the doctrine of equivalents, the features in dispute in the RC–48 controller. In addition, in light of the Federal Circuit's requirement that the elements of the doctrine of equivalents be presented and proven in the form of "particularized testimony and linking argument" to provide a jury with an analytic framework for determining infringement under the doctrine of equivalents, E.I.L. maintains that Plaintiffs failed to provide such particularized testimony and linking arguments in their closing and therefore the jury was "put to sea without guiding charts." *Texas Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558 (Fed.Cir.1996) (citing and reaffirming the holding in *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422 (Fed.Cir.1989)), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997).

█ The patentee bears the burden of showing that the allegedly infringing device actually performs the *identical* func-

---

**3.** Element D of asserted claim 9 is the only feature in dispute. Asserted claims 10 and 14 are dependent on claim 9, and therefore limited by Element D. The disputed element reads,

A suction pressure range control means responsive to the temperature of an area cooled by a system evaporator coil for dy-

namically adjusting said upper and said lower pressure limits to obtain the minimum average system compressor capacity required to obtain the highest average suction line pressure which will maintain said area temperature at a desired level.
PX–3 at col. 16.

tion and uses the same or equivalent structure. *Micro Chemical, Inc. v. Great Plains Chemical Co.*, 103 F.3d 1538 (Fed. Cir.1997), *cert. denied,* 521 U.S. 1122, 117 S.Ct. 2516, 138 L.Ed.2d 1018 (1997). In its JMOL motion, E.I.L. argues that the temperature compensation feature in the asserted claims is limited to the disclosed integrator. Element D of claim 9 of the '700 patent is, as noted, written in the means-plus-function format, and liberal construction of it is statutorily mandated under 35 U.S.C. § 112(6) to cover the structure disclosed in the specification for accomplishing the function recited in the claim element and equivalents to that disclosed structure. E.I.L. contends that the element at issue in asserted claims 9, 10, and 14 is limited in all to the integrator 48 disclosed in the specification. E.I.L. observes that positions taken before the PTO may bar an inconsistent position on claim construction under § 112(6). *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214 (Fed.Cir.1996), *cert. denied,* 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997).

■ In construing claim 9 earlier in this litigation, this Court concluded that the element was in a means-plus-function format based on the literal wording of the claim and on the prosecution history. Regarding the latter, Alsenz had argued in response to the examiner's Office Action dated June 28, 1985 (JX–700, Tab 45) that application claims 9–21 were allowable over the prior art of record because of the "dynamically variable pressure control range" required by the claims. JX–700, Tab 45, at 15. Alsenz also had asserted to the PTO, "The use of integrator 48 to set the cut-in and cut-out comparator voltages permits the cut-in and cut-out set points to be *dynamically* controlled [emphasis in original]." Response to Office Action Dated June 28, 1985, at p. 21. Alsenz therefore had represented to the PTO that the structure for achieving the function of dynamically adjusting the upper and lower set points is integrator 48. Positions taken before the PTO may bar an inconsistent

position on claim construction under § 112(6). *Alpex,* 102 F.3d 1214.

E.I.L. points out that Alsenz's statement is consistent with the disclosure of the specification, in which the only structure for accomplishing the recited function of "dynamically adjusting" is integrator 48. Alsenz bears the burden of demonstrating that the accused device performs the identical function and uses the same or equivalent structure, but has not satisfied it, urges E.I.L. *Micro Chemical, Inc.*, 103 F.3d 1538. Plaintiffs' expert Dr. Sam Shelton could not identify any other structure, material or acts disclosed in the specification. Ex. C to JMOL motion; Trial Transcript ("TT"), Vol. 3 at p. 563. In a Supplemental Response to the Office Action dated June 28, 1995 (JX–700, Tab 50), Alsenz added application claim 25 (which became patent claim 9), application claim 26 (which became patent claim 10), and application claim 29 (which became patent claim 14), and he argued, "Since claims 22–31 added by this Amendment incorporate the same limitations as prior claims [9–12] while adding additional features, such claims are likewise allowable." Thus the element at issue in claims 9, 10, and 14 in each instance is limited to the disclosed integrator, insists E.I.L.

E.I.L. next maintains that integrator 48 operates by integrating the difference between certain parameters in order to dynamically change the set points. Shelton testified that integrator 48 takes the difference between the temperature set point and the actual case temperature and integrates that difference to provide an output that is used to adjust the upper and lower pressure set points. Ex. C.; TT, Vol. 3, at pp. 558–60. Shelton also stated that the amount of temperature difference going into integrator 48 affects the amount of adjustment made to suction pressure set points. *Id.* at p. 560. Thus a small temperature differential going into the integrator will provide a relatively small section set point adjustment, while a large temperature differential going into the integrator

will provide a larger adjustment of the suction pressure set points. *Id.*

When the two devices are compared, E.I.L. argues, the temperature compensation feature of the accused RC–48 controller does not operate the same way as the element in dispute in the '700 patent cases. E.I.L. highlights the fact that Plaintiffs

4. An expert witness for Plaintiffs, Dr. Marks is knowledgeable about computer programming and has a Ph.D. in mathematical sciences.

5. The relevant portion of the TT reads,

Q. Okay. So at some fixed point, you take the total difference and that total difference, according to Mr. Alsenz, that integrator, is what permits the dynamic adjustment?
A. Yes. That integration gives the summation that graphically is represented by that area.
Q. How does the temperature difference between the dairy case and the setpoint, how does that affect the temperature adjustment that the RC–48 does?
A. It doesn't affect it at all. The way the RC–48 works is rather than integrating and summing, a number that's input that is proportional to the difference in temperature, it just always adds one.
Q. Okay. You said that the RC–48 doesn't integrate or sum?
A. Yes it does integrate and sum, but always a one.
Q. Oh?
A. I[ ] didn't say it doesn't integrate.
Q. Oh, so now you're saying—
A. I said it doesn't integrate the difference between the temperatures.
Q. Ah, okay. Doesn't integrate—
A. It integrates a constant which happens to be one.
. . . .
Q. Okay. So in the RC–48 a large temperature difference doesn't affect how much the setpoints are moved?
A. No.
Q. And that's different than what you described for the integrator of the '700 patent?
A. The result will be the same over time, but it does it in a slightly different way, by integrating and summing a constant one PSI at a time rather than a number that is varying depending on the magnitude of the temperature difference.

TT, Vol. 3 at 570–72. Later, Shelton further testified as follows:

Q. In response to Mr. McClanahan's questions about the RC–48 the way it implements its temperature compensation, I be-

have offered no evidence that the RC–48 uses structure, material or acts identical or equivalent to integrator 48 of the '700 patent. Drs. Shelton and Scott Marks [4] testified that the structure or acts used by the RC–48 controller is not affected by the amount of temperature difference. Shelton, Ex. C; TT, Vol. 3 at 571.[5] Marks, Ex. B.; TT, Vol. 3 at pp. 643–44.[6] Thus nei-

lieve your testimony was the result is the same, is that correct?
A. It adjusts the suction setpoint. Yes, it adjusts the suction setpoints until the temperature is met.
Q. Okay. But isn't it true that the way in which the RC–48 does achieve that result is different than the integrator of the '700 patent?
A. Different in that it will always add a constant pressure increment of one psi after each time delay, it will sum one psi rather than [summing] a number that is proportionate to the temperature difference. That is the difference between the two. No question about it.

*Id.* at pp. 599–600.

6. The TT reads,

Q. This software that you've been referring to for the RC–48, it's true, is it not, that it will always only increase the upper and lower suction setpoints by one PSI?
A. Per cycle.
Q. Per time delay, but only one PSI?
A. That's right.
Q. Okay. And this—the temperature difference between the temperature setpoint and the temperature case, like the dairy case, the temperature difference, whether it's a large difference or a small difference, that won't affect in this software that one PSI increase or decrease, will it?
A. No, that's correct.
Q. And the temperature difference, whether it's a large temperature difference or a small temperature difference, that won't affect the time delay period either, will it?
A. That's correct.
Q. So the temperature difference, whether it's large or small, won't make those one PSI increases or decreases occur faster or slower?
A. No. It will just make more of them or fewer of them.
Q. So the temperature difference has no effect on the one PSI—or the magnitude of the temperature difference has no effect on the one PSI increase or decrease?
A. Except to change the number of those one PSI increases or decreases that happen.

ther witness showed that the RC–48 software's integration was an integration of a *temperature* integration. E.I.L. charges Plaintiffs with referring to a totally separate integration function in what became a successful effort to confuse the jury. E.I.L. suggests such tricks are one reason why the law requires linking evidence and argument to demonstrate infringement under the doctrine of equivalents, as well as explains that the Plaintiffs did not offer such an argument in closing because it would have revealed the insufficiency of the evidence.

Although Drs. Shelton and Marks testified that the overall result of the temperature compensation feature of the RC–48 was substantially the same as that of claims 9, 10 and 14 of the '700 patent, there was no testimony by either expert that the *way* in which that result is achieved by the RC–48 is substantially the same as the way in which the suction pressure range control means of claims 9, 10, and 14 achieves its results. *Alpex*, 102 F.3d at 1222–23 (holding that expert testimony concerning § 112(6) that only relates to evidence of a functional result is not adequate to prove that the claimed device operated in substantially the same way). Both experts also agreed that the accused RC–48 device was constructed differently from what was claimed and that it performed its function in a different way. Shelton, Ex. C; TT, Vol. 3 at pp. 599–600. Marks, Ex. B, TT, Vol. 3, at pp. 640, 645. Plaintiffs offered no particularized evidence to demonstrate that the difference was not substantial, but only offered generalized and therefore legally insufficient testimony on overall similarities. *Id.* at pp. 588–89; at pp. 640, 645.

Based on the evidence in the record provided by Plaintiffs, E.I.L. sums up that there is not sufficient evidence that a reasonable jury could conclude that the temperature compensating feature of the RC–48 is covered by the element at issue on claims 9, 10 or 14 of the '700 patent, either literally or under the doctrine of equivalents.

Thus as a matter of law, E.I.L. insists that the accused RC–48 controller did not infringe literally or under the doctrine of equivalents because it did not operate in the same way as the element at issue in claims 9, 10 and 14 of the '700 patent. Merely proving an equivalent functional result between an accused device and a patented invention is not sufficient to prove infringement under the doctrine of equivalents if the patentee fails to show that the result is accomplished in an equivalent way. Expert testimony regarding § 112(6) that only relates to evidence of a functional result is not enough to prove that the claimed device operates in substantially the same way. *Alpex*, 102 F.3d 1214. Equivalence under § 112(6) requires only that the accused device perform the same function and have the same or an equivalent structure as described in the patent; infringement under the doctrine of equivalents requires that "the accused device performs substantially the same function in substantially the same way to achieve substantially the same result." *Id.* at 1222.

Here, E.I.L. argues, Plaintiffs' own experts testified that there is an equivalence of functional results between the '700 patent and the RC–48 controller, but they failed to show that there is an equivalence in the way those results are achieved.

Q. That happened over some period of time?
A. That's right.
Q. But it doesn't affect the time period, the delay period, at the end of which the one PSI increase or decrease occurs?
A. That's right. In my discussion of counting the squares, it only counts one square per time delay. It waits the time delay and then its says, huh, another square. And so by the time it's through counting all the squares, it's gotten all the squares counted, you'd have to count more if there was a big difference. But it does wait and count them one at a time, one per delay.
TT, Vol. 3 at 643–44.

Like the plaintiffs in *Alpex,* Plaintiffs here are arguing the results are the same, but those results are achieved in a different way because the accused device makes incremental adjustments until the entire adjustment has been made, rather than making a single adjustment based on the amount of temperature difference.

Furthermore, E.I.L. emphasizes that the three elements of infringement under the doctrine of equivalents, i.e., substantial equivalence in function, way, and result, must be proven with "particularized testimony and linking arguments." *Texas Instruments,* 90 F.3d 1558 (holding that a patentee must present particularized testimony and linking argument in a doctrine of equivalents issue) (citing and reaffirming *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422 (Fed.Cir.1989))[7]; *see also Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320 (Fed.Cir.1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992). Generalized or conclusive statements about substantial similarity are not adequate. *Id.,* 90 F.3d at 1567. E.I.L. asserts that the RC–48 controller as a matter of law does not infringe under the doctrine of equivalents because Plaintiffs failed to prove all three elements with particularized testimony and linking arguments. E.I.L. claims that in their closing arguments, Plaintiffs offered only conclusive statements about the similarity of the functional results of the accused RC–48 controller and the patented device, without giving the jury any references to particularized testimony or alleged similarities between the ways in which these results are achieved. E.I.L. quotes portions of the arguments with regard to claims 9 (TT, Vol.9, pp.1945–46) and 10 (TT, Vol. 9, at p.1948). Attorney for Plaintiffs was similarly vague and improper in attempting to show how the evidence proves literal infringement and/or infringement under the doctrine of equivalents, TT, Vol. 9 at p.1949:

> Now, the Judge has broken it down into two different kinds of question. One of them has to do with what's called literal infringement; the other has to do with what's called infringement by equivalence. The testimony that you hear covers both of them, so the answers are going to be the same towards both of them.

E.I.L. also specifically objects to Plaintiffs' counsel's concluding remarks, TT, Vol. 9 at p.1964:

> And when you look to the heart of these machines and you look to see what they really do and you realize that the only argument here is over one little word— all these boxes and all this stuff in this courtroom seem to boil down to one word, to E.I.L., and that is that they say "dynamically" and "continuously" mean different things. That's a bunch of hooey. They both do the same thing.

In sum, E.I.L. maintains that throughout closing arguments, Plaintiffs represented to the jury that the functional result of the RC–48 controller and the invention of the '700 patent are the same, regardless of whether these results are achieved in a substantially similar way. Thus they emphasized only two prongs of the doctrine of equivalents—function and result—to the exclusion of the third and equally important, i.e., way. Therefore Plaintiffs failed to satisfy the requirement that the jury be

---

7. The Federal Circuit explains the reason for these requirements:

> These evidentiary requirements assure that the fact-finder does not, "under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." ... Moreover, without these requirements, the fact-finder has no analytical framework for making its decision and is "put to sea without guiding charts when called upon to determine infringement under the doctrine [of equivalents]." In addition, [the reviewing court] would lack the assurance that the jury was fully presented with a basis for applying the doctrine of equivalents [citations omitted].

*Texas Instruments,* 90 F.3d at 1567.

directed to "particularized testimony and linking arguments" as to how specific evidence and testimony satisfy the three prongs of the doctrine of equivalents. It is impossible to tell if the jury properly considered all three prongs of the doctrine of equivalents. JMOL is appropriate as a matter of law as to the non-infringement of the '700 patent based on Plaintiffs' emphasis on the general similarity of results achieved by the accused RC–48 controller and their corresponding failure to offer particularized testimony and linking arguments as to each of the necessary elements under the doctrine of equivalents.

As a final point. E.I.L. contends that the difference between the temperature compensation features of the '700 patent and the RC–48 controller is significant because of the prior art, which included a device publicly used by Data Checker during 1977 and beyond. The Data Checker device performed the same type of incremental adjustments utilized by the RC–48 controller. The public uses of the Data Checker device more than a year prior to the date of the invention of the '700 patent restricts Plaintiffs from using the doctrine of equivalents to expand the claimed invention to include such incremental adjustments.

E.I.L. points to the testimony of George Gunny as conclusively establishing that (1) the existence of the Data Checker device that included an incremental adjustment technique was not proportional to the amount of temperature difference; (2) the use of this device in public; and (3) this public device dated from at least July of 1977. TT, Vol. 6A, at pp. 1275–76, 1290–91. In view of the existence of this device in the prior art and the presumption of validity of the claims in the '700 patent, it follows that the claims of the '700 patent do not read on such incremental, or non-proportional, adjustments. Therefore Plaintiff should not be allowed to use the doctrine of equivalents to expand their claims to cover this different way of achieving essentially the same results. Emphasizing again that Plaintiffs' failure to present particularized testimony and linking arguments on the three prongs for infringement under the doctrine of equivalents encouraged the jury to overlook the significance of the different ways in which the results were achieved, E.I.L. highlights the point that Gunny's testimony about differences between the Data Checker system and the Husmann device (which used a proportional temperature compensation feature similar to the invention of the '700 patent) underlined the distinction between a temperature compensation feature that adjusts incrementally regardless of the amount of the temperature difference and one that adjusts proportionally based on the amount of temperature difference. TT, Vol. 8, at pp. 1603–04. E.I.L. requests JMOL based on Plaintiffs' failure to present particularized testimony and linking arguments sufficient to determine whether the jury considered the significance of the different ways in which the '700 patent and the RC–48 controller worked.

In sum, E.I.L. asserts that because Plaintiffs only offered proof as to the substantial similarity of the function and result of the RC–48 controller and the invention of the '700 patent, but fatally failed to present any evidence as to the substantial similarity of the way in which that function and result is achieved, JMOL is appropriate. In the same vein, Plaintiffs' failure in closing arguments to present any particularized or linking arguments as to the individual elements necessary for a doctrine of equivalents analysis, which caused the jury in effect to be "put out to sea without guiding charts" and made it impossible to determine whether the jury properly considered each of the elements, supports a JMOL that the RC–48 controller does not infringe the '700 patent.

In opposition, Plaintiffs insist that substantial evidence supports the jury's verdict; indeed, it must stand if substantial evidence supports either the finding of lit-

eral infringement or of infringement under the doctrine of equivalents. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 823–24 (Fed.Cir.1992). Plaintiffs argue that in the jury's answer to Special Interrogatory No. 1, finding literal infringement by the RC–48 of claims 9, 10, and 14 of the '700 patent, the Court must presume that the jury found as a factual matter that all of the elements of claims 9, 10, or 14 were literally present in the RC–48. *Perkin–Elmer,* 732 F.2d at 893 (absent special interrogatories, the law presumes the existence of findings necessary to support the verdict). Plaintiffs assert that E.I.L. failed to demonstrate that any claim limitation of claims 9, 10, and 14 was not literally met. Respecting Special Interrogatory No. 2, Plaintiffs contend that the Court must presume that the jury found that each claim element was met either literally or by equivalents. *Id.; Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 48 U.S.P.Q.2d 1001, 1006–07 (Fed.Cir.1998).

Arguing that substantial evidence supports the jury's verdict on literal infringement, Plaintiffs observe that E.I.L. focuses on the "suction pressure range control means" limitation of claim 9.[8] Regarding this claim limitation, which the Court identified as a means-plus-function limitation, the Court instructed the jury, Ex. B at p. 14,

> The "suction pressure range control" means of claim 9 requires that the controller dynamically adjust the upper and lower suction pressure range limits in response to temperature. This claim element is written in a statutory form of "means-plus-function." Therefore, for literal infringement purposes, this element of the claim is limited to the disclosed structure in the '700 patent and equivalents. The specific structure disclosed in the '700 patent for achieving that function is an integrator 48 which

produces an output voltage based on the integrated difference between the desired temperature and the actual temperature.

This instruction defines the literal scope of the "suction pressure range control means" of claim 9. An accused product meets the means-plus-function limitation under § 112(6) if it performs the identical function recited in the claim using the same, or equivalent, structure identified in the patent. *Intel Corp. v. U.S. International Trade Comm'n,* 946 F.2d 821, 841 (Fed.Cir.1991). A determination of the claimed function, as well as the corresponding structure disclosed in the patent for performing that function, is a matter of claim construction and therefore a matter of law. *Chiuminatta,* 145 F.3d at 1308.

Here, this Court identified the function performed by the "suction range control means" limitation as "dynamically adjust[ing] the upper and lower suction pressure range limits in response to temperature." It identified the corresponding structure as an integrator 48 or the equivalent "which produces an output voltage based on the integrated difference between the desired temperature and the actual temperature." Ex. B at p. 14. After the Court construed the claim, it charged the jury with deciding as a question of fact whether the accused device utilizes the same structure as that described in the specification or its equivalent. Here, because the jury found literal infringement, the presumption arises that it found that the RC–48 included an integrator that produces an output voltage based on the integrated difference between the desired and actual temperatures, or its equivalent. Substantial evidence was presented at trial that the RC–48 performs the claimed function of dynamically adjusting the upper and lower pressure limits with a structure that is the

---

**8.** At trial, E.I.L. conceded that the other limitations of claim 9 were literally present. TT,

same as or equivalent to the integrator as defined by this Court, insist Plaintiffs.

Plaintiffs observe the E.I.L. did not challenge their point that substantial evidence demonstrates that the RC–49 controller performs the claimed function of dynamically adjusting the upper and lower set points. See, e.g., the testimony of Patrick Fitzgerald, TT, Vol. 5 at pp. 1008–30 (RC–48 continually adjusts the upper and lower set points based on the deviation of the actual temperature from the desired temperature when the actual pressure is within the pressure set points). They point to support in E.I.L.'s own advertising literature. *Id.* at 1008; PX–11 (Ex. E) at p. E003802 (RC–48 system continually floats the pressure set points).[9] Plaintiffs also point out that the RC–48 manual states that it "varies the evaporator coil's temperature continually by adjusting the operating suction pressure automatically." PX–20 (Ex. F) at p. E004316–19). See also PX–40 (Ex. G) at p. E000055); PX–58 (Ex. H) at p. E004414; PX–59 (Ex. I); and PX–364 (Ex. L).

As for the experts, Plaintiffs argue that Dr. Marks testified that the software in the RC–48 performs the same function as that recited in the "suction pressure range control means" claim limitation. TT, Vol. 3 at p. 618. Dr. Shelton testified that the accused device includes a temperature compensation feature that permits it to adjust automatically the pressure set points. TT, Vol. 2A at pp. 469–71. Shelton stated that the temperature compensation feature was implemented by placing a temperature sensor in a refrigeration case, as shown in PX–20 (Ex. F) at p. E004342 and then automatically adjusting the pressure set points based upon the temperature sensed in the case. TT, Vol. 2A at pp. 471–73, 484. Thus, Plaintiffs conclude,

substantial evidence supports its argument that the RC–48 dynamically adjusts the upper and lower pressure set points and therefore performs the identical function of the claimed "suction pressure range control means".

Furthermore, Plaintiffs charge, it is uncontested that the RC–48 included an integrator. Because substantial evidence supports the finding that the RC–48 performs the claimed function, literal infringement exists if the RC–48 included the same or equivalent structure to the "suction pressure range control means" described in the patent and as defined by this Court. They maintain that the record, including substantial evidence that the microprocessor and software of the RC–48 is an integrator consistent with the Court's construction, supports the jury's finding of literal infringement. For instance, Shelton testified that an integrator performs summation over time. TT, Vol. 2A, at pp. 485, 514 (an integrator is a device "for summing up or creating a summation and keeping a tally of that integration and that summation"). The RC–48 Manual explains that the RC–48 compares the desired temperature with the actual temperature and when it detects a difference, the microprocessor in the RC–48 floats the pressure set point over time. If the actual temperature is below the desired temperature, the RC–48 processor adds one pound per square inch of pressure to the pressure points set for each measurement period during which there is a temperature difference. TT, Vol. 3 at 512–13. In sum the RC–48 operates as "an accumulator in which the pressure is added, one pound per square inch is added each time." TT, Vol. 3 at 513. Thus according to Shelton, the RC–48 works as an integrator to reduce the pressure set points; when the

9. Specifically, it provides,
   If the fixture is operating below the required temperature for a set period the control can automatically adjust the pressure set points up one pound in an effort to maintain as high a suction pressure as possible while still maintaining proper fixture temperature. The set points will continually adjust upward after another time delay period until the proper fixture temperature is achieved.

actual temperature is higher than the desired temperature, the RC–48 microprocessor performs an accumulation process to cause it to add or subtract one psi for each time period to float the suction pressure set points. TT, Vol. 3 at pp. 511–14.

According to the testimony of Dr. Marks, the RC–48 contains a microprocessor programmed with instructions stored in the "read only" memory ("ROM"). TT, Vol. 3 at pp. 614–15. Marks discussed the software code at length (*id.* at 625–35), and pages from the software code were distributed to the jury (PX–437, Ex. M). Marks testified that the code reflected that the temperature compensation software can accept input signals from one or two temperature sensors. TT, Vol. 3 at 627. Marks identified the code section that made the RC–48 adjust the pressure set points upwards when the temperature in the case was too cold and downward when it was too hot. *Id.* at 627–30. Marks further stated that the amount of increase or decrease of the pressure set points was defined in the code as a variable a. *Id.* at 634. The version of the code examined by Marks had the value set for variable a requiring the addition or subtraction of a value of 2. Because the unit of measure was 0.5, this version of the RC–48 was programmed to add or subtract the suction pressure in increments of 1 pound per square inch. *Id.* at 634–35.

Moreover, emphasize Plaintiffs, E.I.L. failed to argue that the microprocessor and software do not comprise an integrator, and its brief at p. 4, even concedes that it performed integration functions.

Thus, insist Plaintiffs, there was substantial evidence in the record from which the jury could have reasonably determined that the microprocessor and software in the RC–48 were the same as the integrator of claim 9 as construed by the Court.

Even if the RC–48 were not the same as the integrator disclosed in the specification, Plaintiffs argue that it had an equivalent structure and literally infringed on Claim 9 based on the fact that the structure of the RC–48 is equivalent under 35 U.S.C. § 112(6) to the integrator structure of claim 9. Plaintiffs identify, as the only potential difference between the RC–48 integrator and that described in the specification, that RC–48 uses software and a microprocessor, while the '700 patent integrator uses hard-wired components. *Cf. Endress + Hauser, Inc. v. Hawk Measurement Systems Pty., Ltd.,* 32 U.S.P.Q.2d 1768, 1994 WL 736442 (S.D.Ind.1994), *aff'd,* 122 F.3d 1040 (Fed.Cir.1997).

For substantial supporting evidence, Plaintiffs point to Dr. Marks' testimony that hard-wired devices can be interchanged with programmed microprocessors. TT, Vol. 3 at pp. 612–14. Marks further testified that integrator of the '700 patent and the RC–48 were interchangeable.[10] Interchangeability, Plaintiffs contend, is strong evidence of equivalency. *Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146. After the jury was shown the differences between the integrator of the RC–48 and that in the specification, the jury was asked for and made a determination of equivalency, and it is presumed to have found that the microprocessor in the RC–48 was at least equivalent to the integrator disclosed in the '700 patent. Their verdict is supported by substantial evidence, insist Plaintiffs.

Moreover, Plaintiffs charge that E.I.L. ignores the law of literal infringement and

---

10. E.I.L. contends that this argument is not persuasive and, for support, quotes from *Chiuminatta,* 46 U.S.P.Q. at 1757, 145 F.3d 1303, Almost by definition, two structures that perform the same function may be substituted for one another. The question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another. Moreover, a finding of known interchangeability, while an important factor in determining equivalence, is certainly not dispositive.... *Such evidence does not obviate the statutory mandate to compare the accused structure to the corresponding structure* [emphasis added, citations omitted].

dedicates its JMOL motion to infringement under the doctrine of equivalents and to the tripart test of function-way-result, which Plaintiffs emphasize is not applicable to a literal infringement analysis.[11]

In its doctrine of equivalents argument, E.I.L. asserts that the '700 patent integrator produces an output with a value proportional to the differences between the actual and the desired temperatures, while the RC–48 integrator produces a stepped function output having a value that changes by a fixed amount each period, i.e., E.I.L. distinguishes them by their methods of operation. Plaintiffs contend that this particular method of integration is not part of the literal scope of the "suction pressure range control means" limitation of claim 9, as construed by the Court, and therefore any differences in the specific method of integration have no bearing on literal infringement.

Plaintiffs maintain that E.I.L. cannot now rewrite claim 9 and the jury instructions to require that the integrator produce a proportional output voltage and not a stepped output voltage. It is improper to read such a requirement into the claims and the Court's jury instructions, they maintain. A claim should not be limited to the preferred embodiment. *Comark*, 156 F.3d 1182, 48 U.S.P.Q.2d at 1005. This axiom also applies to a means-plus-function format. *Cybor*, 138 F.3d at 1470–71 (Plager, J., concurring). In construing a means-plus-function claim, while the corresponding structure from the specification is inserted into the claim, it is improper to limit the claim to other details of the preferred embodiment, such as the method of operation. *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed.Cir.1997) (in § 122(6), "structure and material go with means, acts go with steps"); *Intel*, 946 F.2d at 843; *Durango Associates, Inc. v. Reflange, Inc.*, 843 F.2d 1349, 1357 (Fed. Cir.1988). Therefore, maintain Plaintiffs.

E.I.L. cannot escape literal infringement by implementing a different type of integration, i.e., "stepped function" integration, rather than "proportional integration," in its RC–48, because claim 9 of the '700 patent is not limited, or specific, as to the method of operation of the "suction pressure range control means." They insist that the RC–48 includes every limitation of claim 9 and therefore infringes literally. *Mannesmann Demag Corp. v. Engineered Metal Prod.*, 793 F.2d 1279, 1282 (Fed.Cir. 1986).

Because the jury found there was literal infringement here, a separate verdict on infringement under the doctrine of equivalents is only important if the Court granted JMOL that there was no literal infringement.

Plaintiffs assert that substantial evidence supports the verdict on infringement under the doctrine of equivalents. Plaintiffs argue that the difference in the type of integrations in the RC–48 and the '700 patent emphasized by E.I.L. is insubstantial. Shelton testimony, TT, Vol. 2A at p. 481, Vol. 3 at 571. Shelton testified that despite the difference in integration, "the result will be the same over time, but [the RC–48] does it in a slightly different way...." TT, Vol. 3 at 572. Plaintiffs contend that the fact that the RC–48 operates in a slightly different way does not mean there is no equivalency. *Intel*, 946 F.2d at 843; *Endress + Hauser*, 32 U.S.P.Q.2d at 1777.

Furthermore, Dr. Marks testified at length about the operation of the different types of integration and stated that the difference in adding one psi increment each period like the RC–48 or adding a variable increment as in the '700 patent is insubstantial, and thus they are equivalent. TT, Vol. 3 at 645. He further testified several times that the two types of integrators were interchangeable, further evi-

---

**11.** *Valmont Industries, Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed.Cir.1993); *Alpex*,

102 F.3d at 1222.

dence of equivalency. TT, Vol. 4 at p. 640; Vol. 2A at 481. See also Shelton testimony, TT, Vol. 3 at 641. The jury was told of the difference between the two types of integration operation in the patent and the RC–48 and found that the difference was insubstantial. Ex. B at 18–19. Equivalency under the doctrine of equivalents exists if the differences are insubstantial. The jury found that the microprocessor in the RC–48 was equivalent to the "suction pressure range control means" of claim 9, as construed by the Court. That verdict should stand because substantial evidence supports the jury's finding that the RC–48 includes all limitations of claims 9, 10, and 14 of the '700 patent, including an integrator or equivalent.

Plaintiffs note that prior art does not restrict the application of the doctrine of equivalents. *Intel*, 946 F.2d at 842 ("Even if the prior art discloses the same or equivalent structure, the claim will not be limited in scope thereby."). E.I.L.'s insistence that the RC–48 cannot be the equivalent of claim 9 under the doctrine of equivalents based on the prior art Gunny Data Checker design fails as a matter of law, they argue. The Gunny Data Checker device does not affect the scope of equivalents because it does not include all of the limitations of claim 9. The jury found that the Gunny Data Checker design did not affect the validity of claim 9 because it did not include all of the elements of claim 9 of the '700 patent, such as element (c) requiring a FIFO operation. At trial Gunny stated that his Data Checker design used a LIFO sequencing scheme. TT, Vol. 8 at 1616–17. Plaintiffs suggest that the absence of element (c) was probably one reason why the jury concluded that the Gunny prior art did not invalidate claim 9. For the same reason the Gunny prior art cannot restrict the application of the doctrine of equivalents as a matter of law.

Plaintiffs also charge that E.I.L.'s focus on the "suction pressure range control means" limitation of claim 9 alone is improper under *Intel*, 946 F.2d at 842. The prior art restriction to the doctrine of equivalents applies to the claim as a whole, not to individual elements of the claim. *Id.* Plaintiffs insist that the absence of the FIFO scheme in the Gunny Data Checker prevents Gunny Data Checker from affecting the range of permissible equivalents.

Moreover, argue Plaintiffs, the contention that prior art restricts the doctrine of equivalents is an affirmative defense to a charge of infringement under the doctrine of equivalents, and the defendant/accused infringer has the burden of proof to show that the accused device is in the prior art. *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed.Cir.1996); *We Care, Inc. v. Ultra–Mark Int'l, Corp.*, 930 F.2d 1567, 1571 (Fed.Cir.1991). Plaintiffs maintain that to prevail on its JMOL motion, E.I.L. must satisfy a burden of proof of overwhelming evidence, which it has failed to do. *Knight v. Texaco*, 786 F.2d 1296, 1298 (5th Cir.1986).

Plaintiffs accuse E.I.L. of mischaracterizing the test for equivalency as a formula requiring a substantial showing of equivalency by function, way and result and insisting that Altech failed to present sufficient evidence showing the substantiality of way. Plaintiffs maintain that to prevail under the doctrine of equivalents, they need only present evidence showing that any differences between a claim limitation and the comparable portion of an accused device are insubstantial. Requiring any more is incorrect. The determination of patent equivalency is "not the prisoner of a formula." *Hilton Davis*, 62 F.3d at 1518. That *en banc* panel of the Federal Circuit further held that the function/way/result test was not the test for equivalency. *Id.* Instead, they argue that the appropriate test is whether the differences between the claimed invention and the accused device are insubstantial (the "insubstantial differences" test). *Id.* at 1518–19. Although the evidence of substantiality will vary in each case, all relevant evidence must be considered. *Id.* at 1518; *Graver Tank & Mfg. v. Linde Air Prods. Co.*, 339 U.S. 605,

610, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) (under the insubstantial differences test, the fact finder must examine all the evidence to determine if the differences between the accused device and the claimed invention are insubstantial). They insist E.I.L. misstates the law in arguing that a patent owner must show that a claimed invention and an accused device operate in substantially the same way to prove infringement under the doctrine of equivalents. The Federal Circuit has continued to use the insubstantial differences as the test for equivalency. *Chiuminatta,* 145 F.3d at 1309; *Fonar Corp. v. General Electric Co.,* 107 F.3d 1543, 1555 (Fed.Cir. 1997), *cert. denied,* 522 U.S. 908, 118 S.Ct. 266, 139 L.Ed.2d 192 (1997); *Pall Corp. v. Micron Separations,* 66 F.3d 1211, 1218 (Fed.Cir.1995), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997). Plaintiffs reiterate that it is legally improper to focus on one factor and ignore the other evidence of equivalency as E.I.L. has done in targeting the "way" factor.

Plaintiffs contend that E.I.L. also misapplies the requirement of particularized evidence and attempts to create a separate requirement for equivalency in addition to that of substantial evidence to support the jury's factual findings. Plaintiffs insist that the particularized evidence requirement and the substantial evidence requirement are one. The purpose of particularized evidence is to insure that a jury is provided with a proper evidentiary basis from which it may permissibly conclude that a claim limitation has been met by an equivalent. *Comark,* 156 F.3d 1182, 48 U.S.P.Q.2d at 1006. Regardless of how equivalency is proven, both requirements are met if the patent owner presents substantial evidence of equivalency. The only requirement of particularized evidence is that the differences be insubstantial.

In reply, E.I.L. insists that the differences between the RC–48 controller and the '700 patent are substantial. The RC–48 controller has a temperature compensation feature that utilizes an incremental (or step) output voltage which does not vary with the amount of temperature difference, while the '700 patent includes an integrator that utilizes a proportional voltage that does vary with the amount of temperature difference. This difference is dispositive of both literal infringement (the RC–48 structure is substantially different from the '700 patent structure and its equivalents) and infringement under the doctrine of equivalents (the RC–48's way of achieving the functional result is substantially different from the way of the '700 patent). Moreover, E.I.L. insists that Plaintiffs' arguments that E.I.L. failed to address literal infringement here and that the function/way/result test is not the proper test of equivalence are ineffectual and therefore they have presented no substantial evidence upon which a reasonable jury could have relied to conclude that the '700 patent was infringed by the RC–48, either literally or under the doctrine of equivalents.

■ Although E.I.L. did not bear the burden of proof on the issue of infringement, E.I.L. points out that a JMOL should be granted even on issues where the movant bears the burden of proof if (1) the movant "has established [its] case by evidence that the jury would not be at liberty to disbelieve" and (2) "the only reasonable conclusion is in [the movant's] favor." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1065 (Fed. Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998). It maintains that because there is no substantial evidence in the record to support the jury's finding of infringement, a JMOL is proper here.

E.I.L. first addresses literal infringement and reiterates that the literal infringement of a means-plus-function claim requires that the accused device perform the identical function using the structure disclosed in the specification or its equivalent. *Intel Corp.,* 946 F.2d at 841. Since determinations of the "function of a means-plus-function claim and the corre-

sponding 'structure' are matters of claim construction for the Court as a matter of law," [12] the Court defined "structure" here as an "integrator 48 which produces an output voltage based on the integrated difference between the desired temperature and actual temperature."

In *Chiuminatta,* 145 F.3d at 1309, the Federal Circuit stated that § 112(6) " 'rules out the possibility that any and every means which performs the function specified in the claim *literally* satisfies that limitation.' ... The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial [emphasis in original]." A determination of equivalent structures under § 112(6) and a determination of equivalence under the doctrine of equivalents both relate to insubstantial changes. *Id.; Alpex,* 102 F.3d at 1221. As the only substantive difference between the two, prior art is not considered during a structural equivalent analysis, but is considered during a doctrine of equivalents analysis. *Intel Corp.,* 946 F.2d at 841. The tools for determining a structural equivalent include the specification, the prosecution history, other claims in the patent, and expert testimony. *Id.*

E.I.L. points out that the relationship between a doctrine of equivalents analysis and a structural equivalents analysis, as applied to means-plus-function claims, clarifies E.I.L.'s strategy. Specifically, it asserts, the determination that the incremental adjustment of the RC–48 controller is substantially different from the proportional adjustment claimed in the '700 patent is determinative of both the doctrine of equivalents analysis and the literal infringement analysis.[13]

Objecting to Altech's characterization that E.I.L. is attempting to rewrite claim 9 and the jury instructions by incorporating

into them the preferred embodiment, E.I.L. insists that the RC–48 controller does not have the same structure or an equivalent as claim 9 because it does not "produce an output voltage based on the integrated difference between the desired temperature and actual temperature." The Court's jury instruction, which E.I.L. and Altech agree defines the literal scope of the suction pressure range means of claim 9, requires the invention to produce such an output voltage based on the integrated difference between the desired temperature and actual temperature, not an incremental output voltage. Altech, itself, states that the jury presumably "found that the RC–48 included an integrator that produces an output voltage based on the integrated difference between the desired and actual temperatures or its equivalent." Plaintiffs' Opposition at 4–5. Altech fails to address the proportional output voltage aspect of the defined structure in other sections of Plaintiffs' Opposition in comparing structures of the '700 patent and the RC–48 controller. *Id.,* Sections IV.D and IV.E at pp. 7–10. Specifically, contradicting the Court's instructions, Altech ultimately and conclusorily claims in Section IV.F on p. 11, "The particular type or method of integration, however, is not part of the literal scope of the suction pressure range control means' limitation of claim 9 as construed by the Court."

E.I.L. charges Altech, itself, with having presented overwhelming evidence that no reasonable jury could have concluded that the RC–48 controller includes the same or equivalent structure as the '700 patent. Specifically, the RC–48 controller does not have "an integrator which produces an output voltage based on the integrated difference between the desired temperature and actual temperature." Its own expert, Dr. Shelton, testified that the amount of

---

**12.** *Chiuminatta,* 145 F.3d at 1308.

**13.** E.I.L. notes that infringement under the doctrine of equivalents is viewed as casting a broader net than literal infringement; thus a

clear and convincing showing of no infringement under the doctrine of equivalents generally suffices to show there is no literal infringement.

temperature difference going into the '700 patent's integrator affects the amount of adjustment made to the suction pressure set points. TT, Vol. 3 at p. 560. Shelton also testified, and Dr. Marks corroborated, that the accused RC–48 controller does not integrate the difference between the temperatures. In other words, the RC–48 controller does not have a structure equivalent to that defined by this Court as a matter of law. TT, Vol. 3 at p. 571; *id.* at pp. 643–44. E.I.L. represents that this evidence that the RC–48 does not integrate the difference between the temperatures as explicitly required by the Court's definition is uncontroverted. Altech's weak attempt to limit this Court's definition is ineffective, and no reasonable jury could have concluded that the RC–48 controller literally infringed the '700 patent.

E.I.L. then focuses on the doctrine of equivalents and quotes the Federal Circuit in *Chiuminatta,* 145 F.3d at 1311:

[W]here the equivalence issue does not involve later developed technologies, but rather involves technology that predates the invention, . . . a finding of non-equivalence for Section 112, Para. 6 purposes should preclude a contrary finding under the doctrine of equivalents. This is because . . . the structure of the accused device differs substantially from the disclosed structure, and given the prior knowledge of the technology asserted to be equivalent, it could readily have been disclosed in the patent. There is no policy-based reason why a patentee should get two bites of the apple.

E.I.L. concludes, the clear and convincing proof that the '700 patent is not literally infringed by the RC–48 controller also controls the doctrine of equivalents issue here. Neither party has claimed that the substantially different structure of the RC–48 controller was not known at the time that the application for the '700 patent was filed. Furthermore, the Gunny Data Checker device included the incremental output voltage prior to the filing date of the patent application. Thus the failure of

Alsenz to include the incremental output voltage in the '700 patent application bars Altech from now claiming this substantially different structure, and the literal infringement analysis also demonstrates as a matter of law that the RC–48 controller does not infringe the '700 patent under the doctrine of equivalents. *Chiuminatta,* 145 F.3d at 1311.

As for the function/way/result test, E.I.L. maintains that it is still the accepted standard for objectively analyzing the doctrine of equivalents. The doctrine of equivalents must be "assessed according to an objective standard." *Hilton Davis,* 62 F.3d at 1518. "Because examination of function, way, and result often discloses the substantiality of the differences between the accused and claimed products or processes, many courts, including the Supreme Court itself, have used this formulation to describe the doctrine of equivalents." *Id.* Although the function-way-result test is not "the" *test,* it

often suffices to assess equivalency because similarity of function, way, and result leaves little room for doubt that only insubstantial differences distinguish the accused product or process from the claims. But evaluation of function, way, and result does not necessarily end the inquiry. . . . Thus evidence beyond function, way, and result is also relevant to the doctrine of equivalents.

*Id.* Therefore, summarizes E.I.L., function, way and result is the accepted norm, but if other *objective* evidence of insubstantial differences is available, it would also be relevant. E.I.L. charges that Altech has not offered any alternative test that deals with objective evidence, but merely provides the testimony of its own witnesses, who have an interest in the outcome of this litigation. Therefore E.I.L. urges that the function-way-result test is the best method to evaluate objectively the substantiality of the differences here.

E.I.L. asserts again that the RC–48 operates in a substantially different way than the '700 patent. The same evidence it

used to show that there was no literal infringement because of substantial difference in the structures of the RC–48 and the '700 patent applies to make a clear and convincing showing of the substantially different way in which the RC–48 controller functions. E.I.L. again refers the Court to the analogous situation in *Alpex*, 102 F.3d at 1223,[14] in which the court found no infringement under the doctrine of equivalents because the plaintiff failed to prove the functional results were reached in the same way. E.I.L. emphasizes that Plaintiffs have failed to comment on *Alpex*, which indicates that a failure to show that an accused device operated in substantially the same way as a patented device constitutes a failure to produce "substantial" evidence of infringement under the doctrine of equivalents. E.I.L. therefore asserts that a reasonable jury could not have concluded that the '700 patent was infringed by the RC–48 under the doctrine of equivalents.

Moreover, E.I.L. maintains that it correctly applied the particularized testimony and linking arguments requirement[15] for meeting the function/way/result test. E.I.L. argues that *Comark* does not overrule or undermine the law on which E.I.L.'s particularized testimony relies, but attempts to reduce the matter to a rule. Thus *Texas Instruments, Lear Siegler,*

and *Malta*, remain good law on the particularized testimony requirement. E.I.L. highlights a statement in *Texas Instruments*, 90 F.3d at 1567: "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." E.I.L. insists that generalized testimony is all that Altech has provided, thus justifying JMOL in favor of E.I.L.

Objecting to Altech's representation that E.I.L. obfuscated the fact that prior art is only relevant to the doctrine of equivalents analysis, E.I.L. asserts that it clearly indicated that the prior art "restricts Plaintiffs from using the doctrine of equivalents to expand the claimed invention to include such incremental adjustments." E.I.L.'s Motion and Memorandum at p. 12. Altech cites *Intel*, which provides, "Although under the doctrine of equivalents prior art restricts the extent to which patent protection can be equitably extended beyond the claims to cover an accused device, the policies underlying that concept are not served by restricting claim *limitations* in the same manner. Claim limitations may, and often do, read on the prior art, particularly in combination patents." 946 F.2d at 842. E.I.L. emphasizes, however, that the *Intel* court introduced these comments by stating that the purpose of considering prior art in the context of the doctrine of equiva-

14.  E.I.L. explains that in *Alpex*, the plaintiff's expert witness testified that the two devices at issue were equivalent because the patented device displayed the whole screen image at once, while the accused device achieved the same result by displaying one slice of the image over and over again until the entire screen image is displayed. *Id.* at 1222. Here, Altech and its witnesses argue that the two devices are equivalent because the '700 patent adjusts the set point in a single adjustment based on the amount of temperature difference, while the RC–48 accomplishes the same result by making incremental adjustments over and over again, until the entire adjustment is completed.

E.I.L. concludes that, as in *Alpex*, Altech did not demonstrate equivalence in the way the functional results were achieved and therefore has failed to prove infringement under the doctrine of equivalents.

15.  E.I.L. agrees that *Comark* correctly interprets prior case law to mean that the purpose of the particularized testimony and linking arguments requirement "is to ensure that a jury is provided with the proper evidentiary foundation from which it may permissibly conclude that a claim limitation has been met by an equivalent." 156 F.3d at 1188. While the *Comark* court decided that such an argument was inappropriate because the defendant had failed to show the jury could not reasonably have found the limitation was literally infringed, *id.* at 1189, E.I.L. contends that it has provided clear and convincing evidence that the jury could not reasonably have found that the '700 patent was infringed either literally or under the doctrine of equivalents.

lents is "to ensure that the patent holder does not obtain a *broader* right to exclude under that doctrine than could have been obtained from the patent office." *Id.*

E.I.L. also quotes from *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,* 904 F.2d 677, 684 (Fed.Cir.), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990), to support its argument that the Gunny Data Checker prior art device should restrict the range of equivalents available to Altech: "The doctrine of equivalents exists to prevent a fraud on a patent, and *not* to give a patentee something which he could not lawfully have obtained from the PTO had he tried." If the applicant cannot draft a hypothetical claim that literally covers the accused device and would have been allowed by the PTO, then the doctrine of equivalents cannot be used to extend the right to exclude to cover the accused device. *Id.*

E.I.L. maintains that prior public use of the Gunny Data Checker device, which employed an incremental adjustment technique, would have prevented Altech from obtaining patent coverage in the '700 patent covering such an incremental adjustment technique, even if the prior art device did or did not use a FIFO scheme. Thus Altech should not be permitted to broaden the scope of the '700 patent to include this subject matter. Moreover, urges E.I.L., the Court should conclude as a matter of law that Plaintiffs have not produced substantial evidence from which a reasonable jury could find that the '700 patent could be broadened.

In sum, E.I.L. argues that there is overwhelming evidence demonstrating clearly and convincingly that the RC–48 controller does not infringe the claims of the '700 patent either literally or under the doctrine of equivalents. Thus the Court should grant a JMOL in E.I.L.'s favor and conclude as a matter of law that the '700 patent is not infringed by the RC–48 controller.

After reviewing the record, the summary judgment proof, and the applicable law, this Court concurs with E.I.L. that its motion for JMOL should be granted. E.I.L. has properly interpreted the law and applied it to the evidence at trial. Plaintiffs have failed to present any evidence of substantial similarity in the way in which the RC–48 and the invention of the '700 patent achieved their similar function and result. They also failed to present particularized testimony or linking arguments about individual elements essential to the doctrine of equivalents analysis, and their obfuscating generalizations may well have confused the jury about both the legal and factual significance of distinctions relating to elements of the accused and patented devices. Accordingly, the Court

ORDERS that E.I.L.'s JMOL motion is GRANTED and that judgment shall be entered in its favor that the temperature compensation feature of the RC–48 does not infringe claims 9, 10 and/or 14 of the '700 patent either literally or under the doctrine of equivalents.