**MAS–HAMILTON GROUP, Plaintiff Cross–Appellant,**

v.

**LaGARD, INC., (now known as Masco Corporation) Defendant– Appellant,**

and

**Hi–Shear Technology Corporation, Defendant.**

Nos. 97–1530, 97–1546.

United States Court of Appeals, Federal Circuit.

Sept. 10, 1998.

**1208**

David E. Schmit, Frost & Jacobs LLP, Cincinnati, Ohio, argued for plaintiff cross-appellant.

Christopher Darrow, Oppenheimer Wolff & Donnelly LLP, Los Angeles, California, argued for defendant-appellant. With him on the brief were Michael D. Harris and Guy Porter Smith.

Before MICHEL, PLAGER, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

Declaratory judgment defendant-appellant, La Gard, Inc. ("La Gard"), appeals the decision of the United Stated District Court for the Eastern District of Kentucky holding after a bench trial that United States Patent No. 5,307,656 (the "'656 patent") was not shown infringed by declaratory-plaintiff/cross-appellant Mas–Hamilton Group's ("Mas–Hamilton's") X–07 lock. *See Mas–Hamilton v. La Gard, Inc.*, No. 94–349, slip op. at 74, 1997 WL 1042597, 21 F.Supp.2d 700 (E.D.Ky. Mar. 5, 1997). Mas–Hamilton, the purported infringer, cross-appeals the district court's determination that the '656 patent is not invalid. Because we hold that

the district court did not clearly err in determining that the accused X–07 lock does not infringe the asserted claims of the '656 patent and that the district court did not err in determining that the '656 patent is not invalid, we affirm on both the appeal and cross-appeal.

## BACKGROUND

The '656 patent is entitled: "High Security Electronic Dial Combination Lock." Figure 1 from the patent has been reproduced below, and description of the disclosed lock will be made with reference to this figure. The electronic combination lock 20 includes a locking mechanism or bolt 36 for operating between a locked condition and an unlocked condition, a rotatable cam wheel 47 having a circumferential surface portion defining a slot 88 such that the rotation of the cam wheel moves the slot, and a movable lever 46 coupled to the locking mechanism for changing the condition between locked and unlocked. The movable lever can be pivoted out of engagement with the cam wheel. When the movable lever engages the cam wheel, rotation of the cam wheel changes the condition of the locking mechanism. A cantilever arm 52 and detent 54 on the lever releasably maintain the lever in a position disengaged from the cam wheel. A solenoid[1] and projectable detent 96 move the lever from its disengaged position to a position engaging the cam wheel thus changing the locking mechanism from the locked condition to the unlocked condition. '656 pat., col. 7, l. 4—col. 8, l. 24.

The accused Mas–Hamilton X–07 lock also utilizes, *inter alia*, a cam wheel including a slot, a movable lever and a cantilever arm. The X–07 lock, however, uses a stepper motor instead of a solenoid to provide power to rotate a partial gear through a complex series of intervening rotatable and pivotable cam members to cause a vertical translation of a slide member to move the lever.

In August 1994, La Gard charged Mas–Hamilton's X–07 lock with infringing the '656

1. The solenoid is not shown in Figure 1, but it is located inside the solenoid housing 62.

patent. In September 1994, Mas–Hamilton sought declaratory judgment that the accused lock does not infringe the '656 patent. La Gard counterclaimed for infringement of the '656 patent in July 1995, and in response, Mas–Hamilton asserted affirmative defenses that the '656 patent is invalid and not infringed. In February 1997, the case was tried to the court, and in a seventy-six page opinion, the district court held the '656 patent not infringed and not invalid. La Gard appeals the determination of no infringement with respect to asserted claims 1, 3, 31, 34, and 43, and Mas–Hamilton cross-appeals the determination that the patent-in-suit is not invalid. This appeal was submitted for our decision following oral argument on July 1, 1998.

We hold that the district court did not clearly err in its noninfringement determination because the accused X–07 lock lacks the "lever operating means" required in asserted claims 1, 3 and 31, and the "movable link member" required in asserted claims 34 and 43. We therefore affirm the district court's finding of no infringement of the '656 patent. Further, because the district court did not err in determining that none of Mas–Hamilton's invalidity theories was proven meritorious, we also affirm the district court's holding that the '656 patent is not invalid.

## DISCUSSION

### I. Jurisdiction

■ Before discussing the merits of this appeal, we must first rule on Mas–Hamilton's pending motion to dismiss the appeal for lack of jurisdiction.

Mas–Hamilton argues that this court lacks jurisdiction over the present appeal because La Gard and Masco Corp. ("Masco") (La Gard's successor-in-interest to the patent-in-suit) each lack sufficient ownership interest in the '656 patent to confer standing. According to Mas–Hamilton, the assignment of title in the '656 patent was silent with respect to the right to sue for past infringement; consequently, only the owner of the patent at the time of the infringement can bring an action for damages resulting from that infringement. Mas–Hamilton asserts, therefore, that La Gard does not have standing to

pursue the appeal because it no longer retains an interest in the '656 patent, and Masco lacks standing because, although it currently owns title to the '656 patent, it did not have title at the time the alleged infringement took place because La Gard did.

■ Mas–Hamilton relies on *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516 (1923), *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 45 USPQ2d 1368 (Fed.Cir.1998), and *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 19 USPQ2d 1513 (Fed.Cir. 1991), for the proposition that only the holder of legal title to a patent at the time of the infringement can bring an action for damages resulting from that infringement. Although that proposition is true, it is not at issue in this appeal. Further, in each of the cases relied upon by Mas–Hamilton, the party asserting infringement was a mere licensee at the time the lawsuit was filed, and the patentee was not originally joined. *See e.g., Crown Die*, 261 U.S. at 39, 43 S.Ct. 254.

In the instant case, when Mas–Hamilton filed its declaratory judgment action against La Gard, La Gard was the owner of the '656 patent. Title to the patent was not transferred until October 21, 1997, after the present appeal was filed. Hence, as required by the above-cited cases, the holder of title to the patent at the time of the infringement brought the action. Further, there is no dispute that Masco is the assignee of the '656 patent and not a mere licensee.

In *Arachnid*, the court repeated the warnings of Supreme Court cases:

> [t]he exception [to the rule that the plaintiff must be the person in whom title to the patent resided at the time of the infringement] is where the assignment of a patent is coupled with an assignment of a right of action for past infringements. The authorities are uniform that the latter assignment must be express, and cannot be inferred from the assignment of the patent itself.

*Arachnid*, 939 F.2d at 1579 n. 7, 19 USPQ2d at 1519 n. 7. Here, although the original assignment transferred "the entire right, title and interest to" the '656 patent, it did not specify that the right to sue for past infringe-

ment was also included. However, on June 1, 1998, La Gard executed a supplementary assignment in which it confirmed "*nunc pro tunc,* that Masco has the right to sue for past infringement since its merger with La Gard."

While it is true that in *Enzo,* we held that "nunc pro tunc assignments are not sufficient to confer *retroactive* standing," 134 F.3d at 1093, 45 USPQ2d at 1371 (emphasis added), that is not the scenario here. In the case at bar, standing was not deficient at the time the suit was filed, nor at the time that the appeal was filed. Hence operation of the supplemental assignment specifying the grant of the right to sue for past infringement is not being used to cure deficient standing.

Further, in *Enzo,* this court had to determine whether an oral exclusive license in combination with a later *nunc pro tunc* written license could confer standing without the holder of the title being joined. We held that it could not. *See Enzo,* 134 F.3d at 1093, 45 USPQ2d at 1370–71. In the instant case, by contrast, the original *assignment* was written, and La Gard is not a separate entity from Masco because after the trial, La Gard merged with Masco and is now a division of Masco. Hence, we hold that standing was not, and is not, lacking on the part of either La Gard or Masco in this appeal. We, therefore, have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994), and Mas–Hamilton's motion to dismiss for lack of jurisdiction is denied.

## II.  Infringement

■■■ A patent infringement analysis involves two steps. First, the court determines the scope and meaning of the asserted claims. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372–74, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claim construction is a question of law, reviewed nondeferentially on appeal. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (*in banc* ) (holding "we review claim construction *de novo* on appeal"). Second, the properly construed claims are compared to the allegedly infringing device. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426,

1431 (Fed.Cir.1992). This court reviews a trial court's factual infringement determination for clear error. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 936, 4 USPQ2d 1737, 1740 (Fed.Cir.1987) (*in banc* ).

■■■ Claim limitations drafted pursuant to 35 U.S.C. § 112, ¶ 6 are termed means-plus-function limitations. Section 112, ¶ 6 provides that such limitations "shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." "The 'means' term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification." *Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1308, 46 USPQ2d 1752, 1755–56 (Fed.Cir.1998). A determination of corresponding structure, therefore, is a determination of the meaning of the "means" term in the claim and is thus also a matter of claim construction. *See id.; B. Braun Med., Inc. v. Abbott Lab.,* 124 F.3d 1419, 1424–25, 43 USPQ2d 1896, 1899–1900 (Fed.Cir.1997) (determining *de novo* which structures disclosed in the specification corresponded to the means limitation); *cf. Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977 n. 8, 34 USPQ2d 1321, 1327 n. 8 (*in banc* ) (reserving only the question whether a determination of equivalence under section 112, ¶ 6 is a question of law or fact).

■■■ The second step in the infringement analysis requires a comparison of the claims to the accused device. *See Cybor,* 138 F.3d at 1467, 46 USPQ2d at 1184 (citing *Winans v. Denmead,* 56 U.S. (15 How.) 330, 338, 14 L.Ed. 717 (1853)). To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. *See id.* (citing *Dolly, Inc. v. Spalding & Evenflo Cos.,* 16 F.3d 394, 397, 29 USPQ2d 1767, 1769 (Fed.Cir.1994)). If even one limitation is missing or not met as claimed, there is no literal infringement. *See Pennwalt,* 833 F.2d at 934, 4 USPQ2d at 1751.

■■■ For literal infringement of a section 112, ¶ 6 limitation, the fact-finder must determine whether the accused device performs

an identical function to the one recited in the means-plus-function clause. *See Pennwalt*, 833 F.2d at 934, 4 USPQ2d at 1739 (holding that if the identical function is not performed, literal infringement is not possible). If the identical function is performed, the fact-finder must then determine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents. *See Cybor*, 138 F.3d at 1467, 46 USPQ2d at 1184.

■ Determination of infringement under the doctrine of equivalents requires the fact-finder to determine whether the structural differences between the particular elements of the accused device and the asserted claim's limitations as recited in the claim and as shown in the corresponding means structures in the specification are insubstantial. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, ——, 117 S.Ct. 1040, 1046, 137 L.Ed.2d 146 (1997); *see also Cybor*, 138 F.3d at 1467, 46 USPQ2d at 1184 (discussing the separate origins of statutory equivalents and the doctrine of equivalents). One way to determine if substantial differences exist is to apply the function-way-result analysis of *Graver Tank*, as sanctioned by *Warner–Jenkinson*. *See Warner–Jenkinson*, 520 U.S. at ——, 117 S.Ct. at 1054; *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

### A. Independent Claims 1, 3, and 31

■ Claim 1 requires, *inter alia:*

*lever operating means* for positively driving said lever toward said cam in response to continued dial rotation after said combination has been entered,....

'656 pat., col. 8, ll. 45 (emphasis added). The parties do not dispute that this claim limitation is in means-plus-function format. *See* 35 U.S.C. § 112, ¶ 6.

Looking to the specification to determine the structure that the inventor intended to perform the specified function, *i.e.*, positively driving the lever toward the cam, we note that the "lever operating means" includes, at least, a solenoid, spherical detent 96, solenoid housing 62, boss 92, and pin 54. *See* Fig. 1, *ante.* A solenoid is an electrically energized coil of insulated wire which produces a magnetic field within the coil to provide power. *See McGraw–Hill Dictionary of Scientific and Technical Terms* 1863 (Sybil P. Parker ed., 5th ed.1994). In operation, the solenoid is actuated to move a plunger 98 to its rightmost position. As the plunger is moved to the right, it causes spherical detent 96 to ride up the head of the plunger. The spherical detent is then exposed above the top of the solenoid housing 62. As the cam wheel continues to rotate, the boss 92 pushes the spherical detent and therefore the solenoid housing, including recess 58, against the bias of spring 112. The pin 54, located in the recess 58, and the cantilever arm 52 move so that the lever 46 pivots until the nose part 48 engages the slot 88 on the cam wheel. At that point, continued linear translation of the solenoid housing causes the pin in the cantilever arm to ride up the ramp surface 60 and onto the outside of the solenoid housing. In order to relock the lock, the dial can be turned in the opposite direction and the process, in essence, is reversed. *See* '656 pat., col. 7, l. 4—col. 8, l. 24. The solenoid, therefore, is a required structure for the "lever operating means" because it provides the power that operates the lever.

■ Next, the trier of fact compares the accused device with the structure disclosed in the specification corresponding to the means-plus-function limitation. *See Pennwalt*, 833 F.2d at 934, 4 USPQ2d at 1739; *accord Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1578, 27 USPQ2d 1836, 1840 (Fed.Cir.1993) ("[I]n order to meet a means-plus-function limitation, an accused device must (1) perform the identical function recited in the means limitation and (2) perform that function using the structure disclosed in the specification or an equivalent structure."). The accused X–07 lock does not use a solenoid to provide power to move the lever. It uses, instead, a stepper motor. A stepper motor is an electric motor that rotates in short and essentially uniform angular movements rather than continuously. *See McGraw–Hill, ante,* at 1918. As the district court aptly pointed out in its section 112, ¶ 6 analysis, the solenoid is continuously operated and hence requires considerable power.

*Mas–Hamilton,* 21 F.Supp.2d at 733. "In contrast, the stepper motor used in the X–07 lock is actuated by a short electrical pulse, remains in its second state without application of power, [and] is returned manually to its original state." *Id.* In addition, the stepper motor translates its power into rotational motion, whereas the claimed solenoid uses linear motion. Hence, we hold that the district court did not clearly err in determining that the stepper motor of the accused X–07 lock is not a structural equivalent under section 112 to the claimed solenoid. The "lever operating means" limitation, therefore, is not literally met by the accused device which substitutes a stepper motor; and hence, the accused X–07 lock does not literally infringe claim 1.

Similarly, under the doctrine of equivalents, if the accused X–07 lock performs a substantially different function or performs in a substantially different way or obtains a substantially different result, it does not infringe claim 1. *See Engel Indus., Inc. v. Lockformer Co.,* 96 F.3d 1398, 1407, 40 USPQ2d 1161, 1167 (Fed.Cir.1996). Although the solenoid and the stepper motor both function to provide power to other components in the lock and hence the lever, as discussed with respect to literal infringement under section 112, ¶ 6, the solenoid draws continuous power and translates its power into linear motion. The stepper motor, however, draws intermittent power and translates its power into rotational motion. The solenoid inside the solenoid housing automatically returns to its original position whereas the stepper motor of the accused device must be manually returned to its original state. We affirm, therefore, the district court's determination of no equivalent infringement, for the district court did not clearly err in holding that the solenoid and the stepper motor provide power to the lever to operate the lock in substantially different ways.

■ Claim 3 requires, *inter alia:*

*a substantially non-resilient lever moving element* for moving the lever from its disengaged position for engaging the protrusion of the lever with the cam surface on the cam wheel so that the rotation of the cam wheel thereafter in the given direction changes the locking mechanism from the locked condition to the unlocked condition; . . . .

'656 pat., col. 9, l. 64—col. 10, l. 2 (emphasis added). The district court determined that this claim limitation, although not reciting the term "means for," is in means-plus-function format and therefore must be interpreted using section 112, ¶ 6. *See Mas–Hamilton,* 21 F.Supp.2d at 730. La Gard contests this determination.

La Gard asserts that the "lever moving element" should not be construed as claimed in means-plus-function format because it does not employ the catch phrase "means for." La Gard relies on *Greenberg v. Ethicon Endo–Surgery, Inc.,* 91 F.3d 1580, 39 USPQ2d 1783 (Fed.Cir.1996), and *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 40 USPQ2d 1019 (Fed.Cir. 1996), for the proposition that if the claim does not use "means for" followed by a statement of function, one should presume that the claim does not invoke section 112, ¶ 6. *See e.g. Greenberg,* 91 F.3d at 1583, 39 USPQ2d at 1785.

Although such a presumption is helpful in beginning the claim construction analysis, it is not the end of the inquiry. In the instant case, even though the catch phrase is not used, the limitation's language does not provide any structure. The limitation is drafted as a function to be performed rather than definite structure or materials. *See* 35 U.S.C. § 112, ¶ 6; *Chiuminatta,* 145 F.3d at 1307, 46 USPQ2d at 1755.

La Gard asserts that a "lever moving element" is a known structure in the lock art, but the district court determined otherwise. While true that "[m]any devices take their names from the functions they perform," *Greenberg,* 91 F.3d at 1580, 39 USPQ2d at 1786, the "substantially non-resilient lever moving element" of claim 3 is not one of them. The district court determined that a "lever moving element" had not been shown to have a generally understood structural meaning in the art. *See Mas–Hamilton,* 21 F.Supp.2d at 730–31. We agree. *See Greenberg,* at 1583, 39 USPQ2d at 1786, (holding that "what is important is not simply that [the element at issue] is defined in terms of

what it does, but that the term, as the name for a structure, has a reasonably well understood meaning in the art."). La Gard has not directed this court to any evidence demonstrating that the district court erred in determining that the term "lever moving element" lacks a reasonably well understood meaning in the relevant lock art.

In addition, in *Greenberg*, we emphasized that:

> section 112(6) is triggered [not] only if the claim uses the word "means." The Patent and Trademark Office has rejected the argument that only the term "means" will invoke section 112(6), *see* 1162 O.G. 59 N. 2 (May 17, 1994), and we agree, *see Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957, 220 USPQ 592, 597 (Fed.Cir.1983) ... (construing functional language introduced by "so that" to be equivalent to "means for" claim language).

91 F.3d at 1584, 39 USPQ2d at 1786–87. We also have noted that while traditional "means" language does not automatically make an element a means-plus-function element, conversely, lack of such language does not *prevent* a limitation from being construed as a means-plus-function limitation. *See Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 531, 41 USPQ2d 1001, 1006 (Fed.Cir.1996).

In the instant case, the claimed "lever moving element" is described in terms of its function not its mechanical structure. If we accepted La Gard's argument that we should not apply section 112, ¶ 6, a "moving element" could be any device that can cause the lever to move. La Gard's claim, however, cannot be construed so broadly to cover every conceivable way or means to perform the function of moving a lever, and there is no structure recited in the limitation that would save it from application of section 112, ¶ 6. *See Cole*, 102 F.3d at 530–31, 41 USPQ2d at 1006 (reaffirming that an element in a claim for a combination may be expressed as a means or step for performing a specified function *without the recital of structure*, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof).

Thus, we hold that the district court was correct in applying section 112, ¶ 6 to limit the "lever moving element" to structures disclosed in the specification and equivalents thereof that perform the identical function.

Referring to the specification to identify the corresponding structure that performs the specified function, we construe the "lever moving element" to include at least the solenoid that provides the power to move the lever. '656 pat., col. 7, l. 24—col. 8, l. 7. As already discussed with respect to claim 1, the X–07 lock uses a stepper motor instead of a solenoid. The stepper motor is not the structural equivalent of the solenoid and hence the "substantially non-resilient lever moving element" limitation is not met. We therefore hold that the accused X–07 lock does not literally infringe claim 3 of the '656 patent. Similarly, we conclude that the accused X–07 lock does not equivalently infringe claim 3 of the '656 patent because, under the analysis applied with respect to claim 1, it was not clear error for the district court to determine that the solenoid of claim 3 operates in a substantially different way than the stepper motor of the X–07 lock.

Claim 31 also requires "a lever moving element." '656 pat., col. 16, l. 65. Hence, under the above analysis, the district court did not clearly err in determining that claim 31 is neither infringed literally nor under the doctrine of equivalents. We therefore affirm the district court's finding of no literal or equivalent infringement of claim 31 by the X–07 lock.

**B. Independent Claims 34 and 43**

Claims 34 and 43 both require, *inter alia*:

> a *movable link member* for holding the lever out of engagement with the cam surface before entry of a combination and for releasing the lever after entry of the combination;

'656 Pat., col. 17, ll. 45–48, col. 18, ll. 51–54. The district court construed this limitation under section 112, ¶ 6 as in means-plus-function format. *Mas–Hamilton*, 21 F.Supp.2d at 725. The district court determined that

there was no evidence that a "movable link member" has a well-understood structural meaning in the art. *See id.* (citing *Greenberg,* 91 F.3d at 1583, 39 USPQ2d at 1786).

La Gard argues on appeal that the district court erred in interpreting this claim limitation under section 112, ¶ 6. According to La Gard, the district court erred by considering the claim term "movable" to invoke section 112, ¶ 6. We agree with La Gard that the claim term "movable" *alone* does not cause the claim to be read in means-plus-function format. However, we note that the subsequent functional language requires two functions: (1) "for holding the lever out of engagement with the cam surface before entry of a combination," and (2) "for releasing the lever after entry of the combination." Such language is precisely what was intended by the statutory phrase in section 112, ¶ 6 requiring that means-plus-function limitations provide "a specified function." 35 U.S.C. § 112, ¶ 6. Further, we do not see that the remaining terms in the claim limitation other than those defining the two functions, *i.e.,* "a movable link member," provide any structure as necessary to remove this limitation from the ambit of section 112, ¶ 6. We hold, therefore, that the district court's statement that the term "movable" caused section 112, ¶ 6 to apply, is at most harmless error because the limitation at issue was properly construed in means-plus-function format.

Referring now to the specification to determine the corresponding disclosed structure and equivalent structures for the "movable link member," we note that the lever 46 is held out of engagement with the cam 47 by the arrangement of the cantilever arm 52 located in detent 54, and that upon entry of the correct combination, the solenoid housing 62 is moveable to the right which raises the cantilever arm 52 out of the detent 54 and causes it to travel on top of the solenoid housing. The lever is then released to come into contact with the cam. *See* '656 pat., col. 7, ll. 40–62. Hence, the disclosed structure performs both functions of "holding" and "releasing."

■ In its infringement analysis, the district court determined that the corresponding structure of the X–07 lock did not meet the second required function of releasing the lever after entry of the correct combination. *See Mas–Hamilton,* 21 F.Supp.2d at 735. Specifically, the district court found that "the lever stud is retained at all times within the slot of the slide member." *Id.* The district court relied on the testimony of the president of La Gard on cross-examination that the lever in the X–07 lock is retained in contact with the slide:

> Q. With respect to the movable link member of Claim 34, is it correct that in the portion of the X–07 lock that you have identified with the movable link element of Claim 34, no part of the stud which projects from the rear face of the lever is releasable from the channel in the slide and no part of the lever is released by the slide or slide member movement after entry of the combination?
>
> A. Yes.

Transcript of Trial, at 127–28 (Feb. 7, 1997). We do not find reliance by the district court on this testimony to be reversible error. *See Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1567, 42 USPQ2d 1257, 1261 (Fed.Cir. 1997) (holding that statements made by witnesses, "found credible by the district court, ... provide ample support for the court's factual finding that Glaxo failed to prove infringement"). Hence we hold that it was not clear error for the district court to determine that the structure corresponding to the "movable link member" of the X–07 lock does not perform the function of releasing the lever after entry of the combination, nor to determine that it performs an equivalent function. The stud of the X–07 lock slides up and down in a fixed slot in the slide member and never leaves that slot; whereas the cantilever arm is released from its holding position in the detent 54 and travels along the top of the solenoid housing 62. Moreover, because the stud permanently fixed within the slot is not structurally equivalent to the cantilever arm, which can leave its holding position in the detent and travel along the top of the solenoid, it was not clear error for the district court to determine that it does not literally infringe either claim 34 or claim 43 of the '656 patent. Further, because the function of releasing the lever is entirely

missing from the structure corresponding to the "movable link member" in the accused device, nor was it clear error to determine that it does not infringe under the doctrine of equivalents, either. *See Pennwalt,* 833 F.2d at 949, 4 USPQ2d at 1752 (Nies, J., additional views) (explaining that "when [a limitation] is entirely *missing,* that is, when the accused device does not contain either the exact [limitation] of the claim *or* its equivalent, there is no infringement").

## III. Validity

Mas–Hamilton argues on cross-appeal that the asserted claims of the '656 patent are invalid for a litany of reasons: (1) on-sale bar, (2) public use, (3) best mode, and (4) invention by another.

■■■ Under 35 U.S.C. § 282, a patent is presumed valid and one challenging its validity bears the burden of proving invalidity by clear and convincing evidence. *See Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.,* 26 F.3d 1112, 1115, 31 USPQ2d 1132, 1134 (Fed.Cir.1994); *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376, 231 USPQ 81, 87 (Fed.Cir.1986). While a patentee has the burden of going forward with rebuttal evidence once a challenger has presented a *prima facie* case of invalidity, the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation. *See id.* Mas–Hamilton did not identify for the district court, nor does it here, precisely which claims it contends are invalid. It simply argues that the '656 patent is invalid for a number of general reasons. We discuss only the one that presents the closest question: on-sale bar.

■■■ The ultimate determination of whether an invention was on-sale within the meaning of 35 U.S.C. § 102(b) is a question of law which we review *de novo. See Pfaff v. Wells Elec., Inc.,* 124 F.3d, 1429, 1432, 43 USPQ2d 1928, 1931 (Fed.Cir.1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 1183, 140 L.Ed.2d 315 (1998). We review the factual findings underlying the on-sale determination, however, for clear error. *See id.* at 1433, 43 USPQ2d at 1931. "The relevant inquiry is whether there was a definite sale or offer for sale of the claimed invention prior to the critical date, defined as one year prior to the U.S. filing date to which the application was entitled." *Id.*

■■■ The application that led to the '656 patent was filed on December 17, 1990. Hence, before the district court, Mas–Hamilton had to prove by clear and convincing evidence that there was a definite sale or offer to sell prior to December 17, 1989, and that the subject matter of the sale or offer to sell fully anticipated or rendered obvious the claimed invention. *See Mahurkar v. Impra, Inc.,* 71 F.3d 1573, 1576, 37 USPQ2d 1138, 1141 (Fed.Cir.1995).

Mas–Hamilton asserts that the instant factual scenario more favors finding an on-sale bar than that presented in *Pfaff* in which this court held that the device embodying the asserted claims in the patent-in-suit was on sale prior to the critical date and reversed the district court. *See id.* at 1431, 43 USPQ2d at 1929. In *Pfaff,* verbal and written purchase orders were both received before the critical date, and the parties had a definite agreement before the critical date. *See id.* at 1432, 43 USPQ2d at 1930. Furthermore, in *Pfaff,* there were no facts in dispute, leaving only the legal issue of whether section 102(b) invalidates the patent. *See id.* at 1433, 43 USPQ2d at 1931. Finally, there was no doubt in *Pfaff* that what was offered for sale was the device of the later-issued patent.

By contrast, in the instant case, the parties dispute the primary factual issue—that is, whether Mosler was merely a potential licensee of legal rights, or, rather, a potential customer of devices. The district court found that Mosler was only a potential licensee. *Cf. Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1267, 229 USPQ 805, 809 (Fed.Cir.1986) (holding that "[a]n assignment or sale of rights in the invention and potential patent rights is not a sale of the invention within the meaning of section 102(b)").

Mas–Hamilton asserted before the district court, and argues here, that a November 1989 meeting between officials from La Gard and Mosler constituted placing the lock of

the '656 patent on-sale. According to Mas–Hamilton, the purpose of the meeting was to obtain a contract for ten locks. La Gard argues, however, that the November meeting was solely to interest Mosler in a license under the patent and further that no deal was struck until after the critical date.

The district court found, based on the testimony given, that La Gard presented a prototype to Mosler and offered to furnish additional prototypes that were essentially the same device described in the '656 patent. However, the district court further found that the devices were for testing or show, only, and did not represent commercial sales of the lock even though money changed hands. Moreover, the district court also found that La Gard's offer to Mosler was only an offer of either (1) production rights in the invention, or of (2) the exclusive right to market the invention to the government; neither of which involved a sale or an offer to sell the devices themselves. *Mas–Hamilton*, 21 F.Supp.2d at 714–15. The district court relied on the trial testimony and the totality of the circumstances to determine that "[a]t no time did La Gard offer to sell the invention to Mosler." *Id.*

Furthermore, the testimony also indicated that Mosler (who in 1989 initially contacted La Gard about making a lock that satisfied certain government specifications) provided a purchase order that was never filled, and that no agreement was reached about the particulars of the proposed lock prior to the critical date. From the record, therefore, we do not discern clear error in the district court's finding that there was not a definite sale or offer for sale of the locks later claimed in the patent. Hence, we affirm the district court's conclusion that the '656 patent was not invalid based on the on-sale bar.

Because we hold that the district court did not clearly err in determining that Mas–Hamilton failed to meet its burden that the '656 patent was invalid under any of the above-listed theories, we affirm the district court's holding that the '656 patent was not shown invalid. We only address the on-sale bar issue because we find no merit in any of Mas–Hamilton's other contentions regarding invalidity.

## CONCLUSION

We hold that the district court did not clearly err in determining that the accused Mas–Hamilton X–07 lock does not infringe, either literally or equivalently, any of the asserted claims of the '656 patent which are the subject of this appeal. We also hold that the district court did not clearly err in determining that the '656 patent was not shown invalid by clear and convincing evidence by proof presented by Mas–Hamilton. As to both appeal and cross-appeal, therefore, we

*AFFIRM.*

## COSTS

Each party shall bear its own costs.