# United States Court of Appeals
# for the Federal Circuit

---

**KYOCERA SENCO INDUSTRIAL TOOLS INC., FKA KYOCERA SENCO BRANDS INC.,**
*Appellant*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**KOKI HOLDINGS AMERICA LTD., FKA HITACHI KOKI U.S.A. LTD.,**
*Intervenor*

-------------------------------------------------

**KOKI HOLDINGS AMERICA LTD., FKA HITACHI KOKI U.S.A. LTD.,**
*Appellant*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**KYOCERA SENCO INDUSTRIAL TOOLS INC., FKA KYOCERA SENCO BRANDS INC.,**
*Intervenor*

---

2020-1046, 2020-2050

---

Appeals from the United States International Trade Commission in Investigation No. 337-TA-1082.

————————————

Decided:  January 21, 2022

————————————

DANIEL SHULMAN, Vedder Price P.C., Chicago, IL, argued for Kyocera Senco Industrial Tools Inc.  Also represented by DAVID BERNARD, JOHN K. BURKE, ROBERT STEPHAN RIGG.

CLINT A. GERDINE, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for appellee.  Also represented by DOMINIC L. BIANCHI, WAYNE W. HERRINGTON, SIDNEY A. ROSENZWEIG.

AMOL A. PARIKH, McDermott Will & Emery LLP, Chicago, IL, argued for Koki Holdings America Ltd.  Also represented by PAUL DEVINSKY, ALEXANDER OTT, JAY REIZISS, Washington, DC; JOSEPH H. PAQUIN, JR., Barnes & Thornburg LLP, Chicago, IL.

————————————

Before MOORE, *Chief Judge*, DYK and CUNNINGHAM, *Circuit Judges*.

MOORE, *Chief Judge*.

Kyocera Senco Industrial Tools Inc. and Koki Holdings America Ltd. each appeal from an International Trade Commission decision.  *See Certain Gas Spring Nailer Prods. & Components Thereof*, Inv. No. 337-TA-1082, 2020 WL 2093834 (Apr. 28, 2020) (Commission opinion).  For the following reasons, we vacate and remand.

BACKGROUND

I

In 2017, Kyocera filed a complaint with the Commission. It alleged Koki was violating 19 U.S.C. § 1337 (Section 337) by importing gas spring nailer products that infringe, or were made using methods that infringe, certain claims in five patents.[1] Those patents generally relate to linear fastener driving tools, like portable tools that drive staples, nails, or other linearly driven fasteners. *E.g.*, '718 patent at 1:17–19. Some of the asserted claims cover fastener driving tools, like claim 1 of the '296 patent:

A fastener driving tool, comprising:

> (a) a guide body that has a receiving end, an exit end, and a passageway therebetween, said guide body being configured to receive a fastener that is to be driven from said exit end;
>
> (b) a driver actuation device having a movable member that creates a displacement volume;
>
> (c) an elongated driver member having a first end and a second end, said first end being in mechanical communication with said movable member of the driver actuation device, said second end being sized and shaped to push a fastener from said exit

---

[1]    U.S. Patent Nos. 8,387,718; 8,267,296; 8,267,297; 8,286,722; and 8,602,282.  The original complaint also asserted infringement of a sixth patent, U.S. Patent No. 8,011,547.  But the Commission terminated proceedings with respect to that patent, and no party challenges that termination.

end of the guide body through at least a portion of said passageway of the guide body, and said driver member having at least one longitudinal edge with a plurality of spaced-apart protrusions;

(d) a lifter member which exhibits a contact surface that, at predetermined locations along said contact surface, makes contact with said plurality of spaced-apart protrusions of said driver member such that, when said lifter member is moved in a first direction, it causes a return stroke of an operating cycle and moves said driver member from a driven position toward a ready position, and when said lifter member is moved to a holding position, it temporarily holds said driver member at said ready position by use of a holding contact between said lifter member and said driver member; and

(e) a main storage chamber that is in fluidic communication with said displacement volume of the driver actuation device, wherein:

(i) said main storage chamber and said displacement volume are charged with a pressurized gas,

(ii) when actuated for a driving stroke of said operating cycle, said lifter member moves in said first direction from said holding position and releases said driver member from said holding contact, and said movable member of the driver actuation device is moved by said pressurized gas and moves said driver

> > member from said ready position to said driven position, and
>
> > (iii) said pressurized gas is not exhausted to atmosphere after said driving stroke, but instead is reused for a plurality of said operating cycles;
>
> (f) an energy source used for causing movement of said lifter member; and
>
> (g) a housing that substantially contains said driver actuation device, said elongated driver member, said lifter member, and said main storage chamber, with no external energy source cable and no external hose.

*See also, e.g.,* '296 patent claim 11; '722 patent claims 1, 16. Other asserted claims cover methods for controlling fastener driving tools, like claim 1 of the '718 patent:

> A method for controlling a fastener driving tool, said method comprising:
>
> > (a) providing a fastener driving tool that includes: (i) a housing; (ii) a system controller; (iii) a safety contact element; (iv) a user-actuated trigger; (v) a fastener; (vi) a prime mover that moves a lifter member which moves a driver member away from an exit end of the mechanism; and (vii) a fastener driving mechanism that moves said driver member toward said exit end of the mechanism, said fastener driving mechanism including:
>
> > > (A) a hollow cylinder comprising a cylindrical wall with a movable piston therewithin, said hollow

cylinder containing a displacement volume created by a stroke of said piston, and

(B) a main storage chamber that is in fluidic communication with said displacement volume of the cylinder, wherein said main storage chamber and said displacement volume are initially charged with a pressurized gas;

(b) selecting, by a user, an operating mode of said driving cycle to be one of: a "bottom firing mode," and a "restrictive firing mode;" wherein: (i) if said restrictive firing mode is selected, said tool will operate if said safety contact element has been actuated before said trigger actuator has been operated; and (ii) if said bottom firing mode is selected, said tool will operate if both:

(A) said trigger actuator has been operated, and

(B) said safety contact element has been actuated,

in either sequence;

(c) initiating a driving cycle by pressing said exit end against a workpiece and actuating said trigger, thereby causing said fastener driving mechanism to force the driver member to move toward said exit end and drive a fastener into said workpiece; and

(d) actuating said prime mover, thereby moving said lifter member and causing said driver member to move away from said exit end toward a ready position.

*See also, e.g.*, '718 patent claims 10, 16.

## II

Based on Kyocera's complaint, the Commission instituted an investigation to determine whether Koki was violating Section 337. Notice of Investigation, 82 Fed. Reg. 55,118 (Nov. 20, 2017). After institution, Koki had an opportunity to answer Kyocera's complaint; it denied infringement and argued the asserted claims are invalid.

The ALJ construed various claim terms, ruled on evidentiary issues, and held an evidentiary hearing. During claim construction, the ALJ adopted Koki's construction of "driven position" and Kyocera's construction of "lifter member." He also adopted the parties' agreed-upon construction of "main storage chamber." Later, the ALJ excluded testimony from Dr. John Pratt (Kyocera's technical expert) on infringement under the doctrine of equivalents.[2] Based on these prehearing rulings, the parties stipulated that only the '718 patent remained at issue. J.A. 2–3. So the ALJ conducted an evidentiary hearing limited to that patent.

After that hearing, the ALJ issued an initial determination finding Koki's products did not infringe claims 1, 10, and 16 of the '718 patent. J.A. 155. Specifically, without reaching any other infringement issues, he found those products lacked the claimed "system controller." J.A. 120–24. The ALJ also rejected Koki's invalidity challenges, in

---

[2]   "Under [the doctrine of equivalents], a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).

part because a prior art reference Pedicini[3] did not teach the "main storage chamber" limitation.  J.A. 136–41.

Kyocera petitioned, and Koki contingently petitioned, for the Commission to review the ALJ's initial decision.  *See* J.A. 3.  The Commission elected to review only the ALJ's noninfringement finding.  J.A. 3–4.  But, rather than consider the ALJ's decision on the merits, the Commission remanded.  It directed the ALJ to address whether the accused products met the unaddressed claim limitations and whether Koki induced its customers to infringe.

On remand, the ALJ found the accused products met all but two of the other limitations in the asserted claims.  Specifically, Koki's products lacked the claimed "displacement volume," J.A. 182–84, and did not "initiat[e] a driving cycle by pressing [an] exit end [of the mechanism] against a workpiece," J.A. 189–91.  In analyzing the "lifter member" limitation, the ALJ cited Dr. Pratt's testimony on literal infringement.  J.A. 178.  Notwithstanding his noninfringement findings, the ALJ also addressed inducement.  J.A. 192–93.  He found that, even if direct infringement were shown, Kyocera failed to prove the intent required to induce infringement.

Again, Kyocera petitioned for review, and Koki contingently petitioned for review.  J.A. 4–5.  This time, however, the Commission reached the merits and reversed the ALJ's noninfringement finding.  It found the accused products met the "system controller," "displacement volume," and "initiating a driving cycle" limitations.  J.A. 5.  It also found that Koki induced infringement.  J.A. 6.  Kyocera and Koki separately appeal.  We have jurisdiction under 28 U.S.C. § 1295(a)(6).

---

[3]    U.S. Patent App. Pub. No. 2006/0180631.

DISCUSSION

These appeals challenge various parts of the Commission's opinion, which was limited to the '718 patent, and several of the ALJ's decisions, which implicate the other asserted patents. All told, these appeals address five parts of the investigation below: (I) the exclusion of Dr. Pratt's testimony, (II) the construction of "driven position," (III) the construction of "lifter member," (IV) the construction of "initiating a driving cycle," and (V) whether Pedicini teaches the "main storage chamber."

## I.   Dr. Pratt's Testimony

During claim construction, the ALJ adopted Koki's definition of a skilled artisan:

> A person of ordinary skill in the art relevant to the Asserted Patents would have either (i) a Master's Degree in mechanical engineering with at least two years of *experience in power nailer design*; (ii) a Bachelor's Degree in mechanical engineering with at least five years of *experience in powered nailer design*; or, (iii) ten or more years of *experience in powered nailer design*. This experience in powered nailer design would include mechanical design, tool design, manufacturing, mechanics of materials, stress analysis, ergonomics, and human factors.

J.A. 1476 (emphases added). That definition requires, at minimum, two years' experience designing power nailers. In adopting this definition, the ALJ noted how Kyocera chose not to contest, and even seemed to adopt, Koki's articulation of the ordinary level of skill in the art. *See* J.A. 217–18; J.A. 1676 (Dr. Pratt opining that he "m[et] [Koki's] level of skill and [applied] it in reaching [his] conclusions found in [his] [rebuttal] declaration").

Kyocera offered Dr. Pratt as a technical expert on claim construction, J.A. 1669; invalidity, J.A. 756; literal

infringement, *id.*; and infringement under the doctrine of equivalents, *id.* Dr. Pratt has advanced degrees in engineering and extensive experience in the design and manufacture of fastener driving tools. J.A. 754–75. But he lacks experience in power nailer design. J.A. 2260 ("**Q**[:] Dr. Pratt, do you have experience designing powered nailers? **A**[:] Not nailers.").

Because of Dr. Pratt's lack of experience, the ALJ excluded his testimony on infringement under the doctrine of equivalents. J.A. 262–68. He found that Kyocera failed to preserve any challenge to the level of ordinary skill in the art and that Dr. Pratt lacked that skill. He also reasoned that, because testimony from a skilled artisan is required, Kyocera would be unable to prove doctrine-of-equivalents infringement using Dr. Pratt's testimony. While excluding Dr. Pratt's testimony under the doctrine of equivalents because he was not at a minimum an ordinarily skilled artisan, the ALJ admitted Dr. Pratt's testimony as to literal infringement.

Both Kyocera and Koki challenge the ALJ's order partially excluding Dr. Pratt's testimony. Kyocera argues that Dr. Pratt should have been permitted to testify on both literal and doctrine-of-equivalents infringement. Koki argues Dr. Pratt should not have been permitted to testify at all.[4] The Commission, responding to both Kyocera and Koki, defends the ALJ's order partially excluding the testimony.

We "review the admission of expert testimony for an abuse of discretion." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008); *see also*

---

[4]    Koki preserved this argument by raising it in its contingent petition for review of ALJ's second initial determination. *See* J.A. 4157. We need not reach whether Kyocera preserved its arguments.

*Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1370 (Fed. Cir. 2001) (reviewing an evidentiary determination by the Commission for an abuse of discretion). Because Dr. Pratt lacked ordinary skill in the art, the ALJ abused his discretion by admitting any of Dr. Pratt's testimony.

A

To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art. Without that skill, the witness' opinions are neither relevant nor reliable. The opinions would not be based on any specialized knowledge, training, or experience that would be helpful to the factfinder. In fact, "[a]dmitting testimony from a person . . . with no skill in the pertinent art serves only to cause mischief and confuse the factfinder." *Sundance*, 550 F.3d at 1362. That testimony would "amount[] to nothing more than advocacy from the witness stand." *Id.* at 1364–65.

This is true regardless of whether the witness is being offered to testify on literal infringement, doctrine-of-equivalents infringement, or both. Nothing about literal infringement makes an unqualified witness' testimony more relevant or more reliable. And the same goes for infringement under the doctrine of equivalents. The absence of relevant knowledge and the risk for abuse apply equally to both situations.

Our opinion in *AquaTex Industries, Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007), is not to the contrary. There, we addressed when expert testimony is required: always for doctrine-of-equivalents infringement and sometimes for literal infringement. *Id.* We did not, however, address the minimum qualifications necessary to offer testimony from the perspective of a skilled artisan. Only the latter question is relevant here, and, therefore, *AquaTex* is inapt.

Nor does *Endress + Hauser, Inc. v. Hawk Measurement Systems Party*, 122 F.3d 1040, 1042 (Fed. Cir. 1997), prevent us from requiring a witness to possess at least ordinary skill in the art to testify from the perspective of a skilled artisan in a patent case. To be sure, the person of ordinary skill in the art is a hypothetical construct. *Id.* And as *Endress* recognized, it would be improper to require an expert witness to possess ordinary skill in the art and *nothing more*. If that were the case, "a person of exceptional skill in the art would be disqualified from testifying as an expert because [he is] not ordinary enough." *Id.* (emphasis omitted). But *Endress* itself recognized that, to testify as an expert, a witness must be qualified. *See id.* ("To the extent that the gravamen of defendants' complaint is that Dr. Silva was unqualified to testify as an expert witness at all, the record reflects his substantial credentials as an electrical engineer, and the decision to permit him to testify was well within the discretion of the trial judge."). And to be qualified to offer expert testimony on issues from the vantage point of an ordinarily skilled artisan in a patent case, an expert must at a minimum possess ordinary skill in the art.

B

Here, Dr. Pratt does not have ordinary skill in the art. The level of ordinary skill in the art, adopted during claim construction, requires experience in power nailer design. And Dr. Pratt lacks such experience. Kyocera does not challenge these findings on appeal. *See* Oral Arg. at 10:4–7 ("We're not arguing to change the level of ordinary skill in the art ruling here.").[5] Accordingly, the ALJ abused his discretion by admitting Dr. Pratt's testimony on any issue

---

[5]    Even if Kyocera had not abandoned this challenge, it failed to preserve it. During claim construction, Kyocera accepted and applied Koki's definition of ordinary skill. J.A. 1676.

that is analyzed through the lens of an ordinarily skilled artisan.[6]

## II. "Driven Position"

During claim construction, the parties disputed the meaning of the claimed "driven position" in the '296, '297, '722, and '282 patents.[7]   That dispute centered around whether the construction included positions "at *or near* the bottom-most travel position" (Kyocera's stance) or was limited to the singular position "*at* the bottom most-travel position" (Koki's stance).    The ALJ adopted the latter construction.  And based on the ALJ's construction, Kyocera did not press direct infringement for the '296, '297, '722, and '282 patents.  Kyocera claims the ALJ's construction is incorrect.  We do not agree.

### A

We review claim construction de novo and review any subsidiary factual findings based on extrinsic evidence for substantial evidence.   *Cisco Sys., Inc. v. Int'l Trade Comm'n*, 873 F.3d 1354, 1360 (Fed. Cir. 2017).   Claim terms are generally given their plain and ordinary meaning, which is the meaning one of ordinary skill in the art would ascribe to a term when read in the context of the claim, specification, and prosecution history.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313–14 (Fed. Cir. 2005) (en banc).  "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own

---

[6]    We need not decide in this case the extent to which a person of ordinary skill in the art may rely on the testimony or information supplied by others in reaching conclusions as to infringement or invalidity.  This case presents no such issue.

[7]    These patents share a written description, so without loss of generality, we cite only the '296 patent's specification.

lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term." *Id.* (internal quotation marks omitted).

B

Acting as their own lexicographers, the patentees defined "driven position":

> Referring now to FIG. 3, the piston is depicted at its bottom-most travel position, and in this configuration, the displacement volume 76 and the main storage chamber 74 are at their largest combined volumes, while the cylinder venting chamber 94 is at its minimum volume. *This bottom position is also sometimes referred to herein as the "driven position."*

'296 patent at 12:56–61 (emphasis added). Nothing about this statement suggests the "bottom position" is merely an example of a driven position. It is *the* driven position. Nor does "this bottom position" refer back to "this configuration." Most naturally, "this bottom position" refers back to the only prior mention of the word bottom—the "bottom-most travel position." As the bottom-*most* travel position, this location must be a single position.

The surrounding written description language supports this interpretation. It explains how various chambers are either at their minimum or maximum volume when the piston and driver are at their driven positions. *See, e.g.*, '296 patent at 12:56–60, 62–64; *see also id.* at 26:43–54 ("[T]he displacement volume 457 and the main storage chamber 454 are at their largest combined volumes, while the cylinder venting chamber 492 is at its

minimum volume."). There can be only one minimum and one maximum volume for each chamber, so this context suggests the "driven position" must be a single position. Accordingly, a construction like Kyocera's that includes a range of positions "near the bottom-most travel position" would be inconsistent with the written description.

The written description's discussion of figure 20 does not alter or expand this definition. That discussion is nearly identical to the discussion of figure 3, except that it includes the words "near or at":

> Referring again to FIG. 20, the piston 458 is depicted *near or at* its bottom-most travel position, and in this configuration, the displacement volume 457 and the main storage chamber are at their largest combined volume, while the cylinder venting chamber 492 is at its minimum volume. This bottom position is also sometimes referred to herein as the "driven position."

*Id.* at 26:43–49 (emphasis added). The "near or at" language in this portion of the written description explains what is *depicted* in the figure, rather than what is *defined* as the "driven position." Like the written description of figure 3, this passage defines "driven position" as "[t]his bottom position," referring back to the singular "bottom-most travel position." And the surrounding language again notes how volumes of certain chambers are minimized or maximized when the piston is at this position. Figure 20 is therefore consistent with, and in fact supports, the patentees' lexicography.

Because the patentee clearly defined "driven position" in the written description, that definition controls. *See Thorner*, 669 F.3d at 1365. Thus, like the ALJ below, we construe "driven position" as "at the bottom-most travel position."

### III.    "Lifter Member"

Below, the parties disputed whether the claimed "lifter member" in the '718 patent invokes 35 U.S.C. § 112 ¶ 6.[8] Koki argued that it did, but the ALJ did not agree. He instead construed the claimed "lifter member" to mean a "rotatable component having lifting pins on its face surface." J.A. 245–54. Koki claims the ALJ erred by not applying § 112 ¶ 6. We agree.

### A

Under the text of § 112 ¶ 6, a patentee may draft claims "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." But such claims are construed to cover only "the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc in relevant part). Whether claim language invokes § 112 ¶ 6 is a question of law we review de novo. *Id.* at 1346. We review any underlying findings of fact for clear error. *Id.*

To determine whether § 112 ¶ 6 applies to a claim limitation, we ask "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348. If a limitation does not use the word "means," there is a rebuttable presumption that § 112 ¶ 6 does not apply. *Id.* at 1349. But that "presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates

---

[8]    Congress has replaced 35 U.S.C. § 112 ¶ 6 with § 112(f), effective on September 16, 2012. Leahy–Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284 (2011). Because the application resulting in the '718 patent was filed before that date, we refer to the pre-AIA version of § 112.

that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1348 (quotations and brackets omitted).

## B

The "lifter member" limitation does not use the word means, so there is a presumption that § 112 ¶6 does not apply. But because that claim term does not recite sufficiently definite structure, that presumption has been overcome.

A person of ordinary skill in the art would not understand the claimed "lifter member" to have "a sufficiently definite meaning as the name for a structure." *See Williamson*, 792 F.3d at 1349. That phrase, alone, does not connote structure. It is a non-structural generic placeholder (member) modified by functional language (lifter). *See, e.g.*, *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1214–15 (Fed. Cir. 1998) (holding "movable link member" was subject to § 112 ¶ 6). Indeed, no party claims lifter member has a plain and ordinary meaning to those skilled in the art. *See* J.A. 247 (finding no such meaning exists).

Likewise, the surrounding claim language does not describe any structural detail about the "lifter member." *Cf. Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1359 (Fed. Cir. 2011) (holding "modernizing device" denoted sufficient structure based on surrounding claim language). Claim 1 of the '718 patent provides, in relevant part:

A method for controlling a fastener driving tool, said method comprising:

(a) providing a fastener driving tool that includes . . . (vi) a prime mover that moves a lifter   member   which   moves   a   driver

> member away from an exit end of the mech-
> anism . . .
>
> (d) actuating said prime mover, thereby
> moving said lifter member and causing
> said driver member to move away from said
> exit end toward a ready position.

This language requires the prime mover to move the lifter member and describes the lifter member's function as lifting the driver member. It does not specify whether or how the prime mover is connected to the lifter member. Nor does the description of the lifter member's function add any structural detail. The only thing a skilled artisan could glean from the claim language is that the lifter member is moved by the prime mover and lifts the driver member.[9] That is a purely functional description.

Nothing in the written description provides a clear and unambiguous definition of "lifter member." *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1342 (Fed. Cir. 2019) (explaining lexicography can avoid application of § 112 ¶ 6). At various points, the written description provides examples of a "lifter member." For example, it explains that "the rotary-to-[linear ]lifter 100 is also sometimes referred to herein as a lifter member, or simply as a lifter." '718 patent at 8:50–52 (quotation marks omitted); *see also id.* at 21:26–28. But each of these passages provides an example of *a* lifter member, rather than a definition of *the* lifter member. There is no lexicography. And

---

[9]    Dr. Vallee's testimony is not to the contrary. *See* J.A. 1612 ¶ 91. That testimony related to the "lifter member" term in other asserted patents: the '296, '297, and '722 patents. The claim language in each of those patents contains an extensive structural description of the lifter member. *See* '296 patent claim 1(d). The '718 patent lacks such structural claim language.

the parties have not identified other language in the written description that indicates § 112 ¶ 6 should not apply to the claimed "lifter member."

For these reasons, § 112 ¶ 6 applies to the "lifter member" limitation, and it must be construed to cover only "the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347 (quoting § 112 ¶ 6). Because the parties have not thoroughly briefed what structures correspond to the claimed "lifter member," we leave that question for the Commission on remand.

### IV. "Initiating a Driving Cycle"

The asserted claims in the '718 patent require "initiating a driving cycle by pressing said exit end against a workpiece." The parties did not contest the interpretation of this phrase, and accordingly, the ALJ and Commission applied its plain and ordinary meaning. J.A. 49–58 (Commission), 189–91 (ALJ). But in their infringement arguments, Kyocera and Koki disputed whether this limitation could be met by pressing the claimed "safety contact element" against a work piece. *See* J.A. 190. To resolve that dispute, the ALJ expounded on the plain and ordinary meaning of the "initiating a driving cycle" limitation. He held that the claimed "safety contact element" is distinct from the claimed "exit end of the mechanism." J.A. 190–91. Thus, initiating a driving cycle by pressing the safety contact element, rather than the exit end, against a workpiece would not meet the claim language. *Id.*

Kyocera petitioned for review by the Commission, in part arguing that the "safety contact element" is part of the "fastener driving mechanism." **[*see* Petition at 16–28, In Certain Gas Spring Nailers and Components Thereof; No. 337-TA-1082, DI 1493120]** Specifically, it argued the exit end of the "safety contact element" was the "exit end of the [fastener driving] mechanism." So under Kyocera's construction, a tool that initiates a driving cycle

by pressing the exit end of a safety contact element against a workpiece would meet the claim language. The Commission agreed with Kyocera's construction. J.A. 56. Koki argues the Commission erred. We agree.

A

Though Koki frames this as a failure-of-proof argument, **[see GB16,]** we view it as an issue of claim construction. Koki focuses on the meaning of the claims, not the evidence presented below. Thus, we begin with the Commission's argument that Koki did not preserve its claim construction arguments.

Because Koki is "clarifying or defending the original scope of its claim construction," we see no issue with considering the merits of its arguments on appeal. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) (declining to apply waiver). Below, the parties agreed to a plain-and-ordinary-meaning construction. And Koki forwarded its understanding of that meaning to the ALJ, Commission, and now to us on appeal.[10] Thus, Koki has not failed to preserve its arguments on appeal.

B

The "safety contact element" and "exit end of the mechanism" are distinct components. The asserted claims list those elements separately:

---

[10]    Notably, this contrasts starkly with Kyocera's argument that "exit end of the mechanism" refers to the exit end of "the tool." Kyocera never presented that argument below, so neither the ALJ nor the Commission addressed it. Instead, the parties agreed "the mechanism" refers to the "fastener driver mechanism." Accordingly, Kyocera failed to preserve its argument on this point.

> A method for controlling a fastener driving tool, said method comprising:
>
> > (a) providing a fastener driving tool that includes: . . . (iii) *a safety contact element* . . . (vi) a prime mover that moves a lifter member which moves a driver member away from *an exit end of the mechanism* . . . .

'718 patent claim 1 (emphasis added); *see also id.* (separately listing "(vii) a fastener driving mechanism . . ."). There is, therefore, a presumption that those components are distinct. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010).

No party has identified claim language overcoming the presumption that the exit end of the mechanism and the safety contact element are distinct components. Nor is there any language in the written description that overcomes that presumption. Many places in the written description explain how pressing a safety contact element against a workpiece may be used to initiate a driving cycle. *See, e.g.*, '718 patent at 7:47–51, 11:60–12:15, 13:37–41, 26:10–37, 27:54–59. But the written description is not uniform on this point. At times, it describes pressing the safety contact element against the workpiece until the tool is pressed against the workpiece. *See id.* at 33:42–47 ("[A decision step] determines whether or not the safety contact element 418 has been pressed against a solid object to an extent that actuates the sensor (e.g., limit switch 432), which means that *the tool is now pressed against a surface* where the user intends to place a fastener." (emphasis added)). Only then, once the tool's fastener driving mechanism is pressed against the workpiece, is a driving cycle initiated.

Thus, the written description arguably discloses multiple embodiments. In one embodiment, a driving cycle is initiated by pressing the safety contact element against the workpiece. In another, a driving cycle is initiated by

pressing the exit end of the mechanism against the work-piece.  The patentees were free to claim only the latter embodiment.  *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("[T]he mere fact that there is an alternative embodiment disclosed in [a] patent that is not encompassed by [a] claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.").

Accordingly, we construe the "safety contact element" and "fastener driving mechanism" as separate components.  Thus, the "exit end of the mechanism" cannot be the exit end of the safety contact element, and the "initiating a driving cycle" limitation cannot be met by pressing the exit end of a safety contact element against a workpiece.

## V.   "Main Storage Chamber"

Finally, the parties dispute whether a reference, Pedicini, teaches the claimed "main storage chamber."  Based on the parties' agreement, the ALJ construed "main storage chamber" to mean "a chamber that is distinct from the volume of the cylinder and contains part of the working air volume during operation."  J.A. 229.  The ALJ found Pedicini does not disclose a *distinct* main storage chamber because it only disclosed one component—air chamber 13.  J.A. 138–39.  Based in part on that finding, the ALJ held the asserted claims would not have been obvious over Pedicini in combination with other references.  Koki claims the ALJ's finding about Pedicini's teachings, which we review for substantial evidence, *see Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1321–22 (Fed. Cir. 2012), was based on an erroneous application of the agreed-upon claim construction.  We do not agree.

The ALJ's analysis is supported by substantial evidence and is consistent with the agreed-upon construction.  The specification describes the "main storage chamber" as distinct from the working cylinder, a.k.a., the "hollow

cylinder." *See, e.g.*, '718 patent claim 1, 8:29–41. That is, the claims require two distinct structures: the main storage volume and a smaller "hollow cylinder" contained within the main storage volume. The agreed-upon construction confirms that requirement, noting the "main storage chamber" must be "distinct from the volume of the cylinder," i.e., the hollow cylinder. J.A. 229. It was not error, therefore, for the ALJ to require Pedicini to disclose two separate structures for it to teach the "main storage chamber" limitation. And substantial evidence supports the ALJ's finding that Pedicini has only one structure. The Pedicini figure upon which Koki relies shows a single structure. *See* J.A. 136–41 (discussing J.A. 2616, which is an annotation of figure 1 in Pedicini, *see* J.A. 2460).

## CONCLUSION

For the foregoing reasons, we vacate and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

Costs to Koki.